[928 NE2d 1048, 902 NYS2d 851]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TARA GRAVINO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT W. ELLSWORTH, Appellant.

Argued March 25, 2010; decided May 11, 2010

## POINTS OF COUNSEL

*Kathleen P. Reardon*, Rochester, for appellant in the first above-entitled action. I. The trial court erred in failing to conduct a *Gomberg* inquiry. (*People v Clarke*, 93 NY2d 904; *People v Lopez*, 71 NY2d 662; *People v Abar*, 99 NY2d 406; *People v Harris*, 99 NY2d 202; *People v Longtin*, 92 NY2d 640; *People v Berroa*, 99 NY2d 134; *People v McDonald*, 68 NY2d 1; *People v Gomberg*, 38 NY2d 307.) II. Defendant's conviction must be vacated under the second prong of the *Gomberg* test because defendant has established that her defense was affected by the existence of a conflict. (*People v Recupero*, 73 NY2d 877; *People v McDonald*, 68 NY2d 1; *Holloway v Arkansas*, 435 US 475; *People v Harris*, 99 NY2d 202; *People v Alicea*, 61 NY2d 23; *People v Ortiz*, 76 NY2d 652; *People v Macerola*, 47 NY2d 257.) III. A *Gomberg* inquiry is just as essential in a conviction resulting from a plea. (*People v Recupero*, 73 NY2d 877; *People v Monroe*, 54 NY2d 35, 455 US 947; *People v McDonald*, 68 NY2d 1; *People v Longtin*, 92 NY2d 640; *People v Mourad*, 13 AD3d 558; *Hill v Lockhart*, 474 US 52.) IV. Counsel had an ethical obligation to avoid a conflicted counsel situation. V. Failure to advise defendant of her impending Sex Offender Registration Act registration should result in vacation of the conviction. (*People v Smith*, 37 AD3d 1141; *People v Catu*, 4 NY3d 242; *People v Ford*, 86 NY2d 397.)

*Richard M. Healy, District Attorney*, Lyons (*Christopher Bokelman* of counsel), for respondent in the first above-entitled action. I. The trial court did not err in failing to conduct a *Gomberg* inquiry because there was no evidence before the court of defendant's counsel being conflicted in his representation of defendant. (*People v Harris*, 99 NY2d 202; *People v Ortiz*, 76 NY2d 652; *People v Alicea*, 61 NY2d 23; *People v Coss*, 19 AD3d 943; *People v Henderson*, 11 AD3d 366.) II. Defendant's guilty plea was voluntarily made, and a lack of knowledge does not make the plea involuntary. (*People v Dorsey*, 28 AD3d 351; *People v*

*Vere*, 44 AD3d 690; *People v Nash*, 48 AD3d 837; *People v Smith*, 37 AD3d 1141; *People v Stevens*, 91 NY2d 270; *People v Coss*, 19 AD3d 943.) III. As defendant's arguments are based on matters outside the record, a CPL article 440 motion to vacate the judgment is the proper mechanism to seek redress. (*People v Henderson*, 11 AD3d 366.)

*Kathleen B. Hogan, District Attorney*, White Plains (*Steven A. Bender* and *Anthony J. Servino* of counsel), for District Attorneys Association of the State of New York, amicus curiae in the first above-entitled action. The Sex Offender Registration Act (SORA) is a collateral, not direct, consequence of a sex offender's conviction; thus, the court's failure to advise defendant of her duties under SORA does not, alone, undermine the voluntary, knowing and intelligent guilty plea made; while it is preferable for the court to make a record of the prior representation, the failure to do so does not warrant relief for defendant and to the extent defendant asserts a broader claim of trial counsel's ineffectiveness, that claim is based on facts outside the appellate record, and is more properly pursued under CPL 440.10. (*People v Windham*, 10 NY3d 801; *People v Louree*, 8 NY3d 541; *People v Ford*, 86 NY2d 397; *People v Harris*, 61 NY2d 9; *Boykin v Alabama*, 395 US 238; *Cuthrell v Director, Patuxent Inst.*, 475 F2d 1364, 414 US 1005; *Brady v United States*, 397 US 742; *Shelton v United States*, 242 F2d 101, 246 F2d 571, 356 US 26; *People v Alemany*, 13 NY3d 424; *People v Mingo*, 12 NY3d 563.)

*Goodell & Rankin*, Jamestown (*R. Thomas Rankin* of counsel), for appellant in the second above-entitled action. Appellant's plea was neither knowing nor voluntary nor intelligent. (*Matter of Tammie Z.*, 66 NY2d 1; *Matter of Marie B.*, 62 NY2d 352; *Matter of Leon RR*, 48 NY2d 117; *Matter of Ella B.*, 30 NY2d 352; *Santosky v Kramer*, 455 US 745; *Lassiter v Department of Social Servs. of Durham Cty.*, 452 US 18; *People v Catu*, 4 NY3d 242; *Brady v United States*, 397 US 742; *People v Ford*, 86 NY2d 397; *People v Seaberg*, 74 NY2d 1.)

*David W. Foley, District Attorney*, Mayville (*Tracey A. Brunecz* of counsel), for respondent in the second above-entitled action. Defendant's plea was knowing, voluntary and intelligent. (*People v Ford*, 86 NY2d 397; *People v Latham*, 90 NY2d 795; *People v Catu*, 4 NY3d 242; *People v Nixon*, 21 NY2d 338; *People v Grant*, 45 NY2d 366; *People v Coles*, 62 NY2d 908; *People v Crimmins*, 36 NY2d 230; *People v Hill*, 9 NY3d 189.)

READ, J.

We hold that because they are collateral rather than direct consequences of a guilty plea, Sex Offender Registration Act (SORA) registration and the terms and conditions of probation are not subjects that a trial court must address at the plea hearing. Put another way, a trial court's neglect to mention SORA or identify potential stipulations of probation during the plea colloquy does not undermine the knowing, voluntary and intelligent nature of a defendant's guilty plea.

I.

*Gravino*

By indictment filed on February 6, 2007, defendant Tara Gravino was charged with rape in the second degree (Penal Law § 130.30 [1]), endangering the welfare of a child (Penal Law § 260.10 [1]), and unlawfully dealing with a child in the first degree (two counts) (Penal Law § 260.20 [2]) for providing alcohol to underage children and having sex with a 14-year-old boy. Gravino was a 34-year-old mother of six in September 2006, when the events underlying the indictment took place.

After unsuccessfully moving to suppress a statement in which she made an admission, Gravino pleaded guilty on August 16, 2007 to one count of third-degree rape (Penal Law § 130.25 [2]) in exchange for a sentence of 1½ to 3 years in prison. During the plea colloquy, Gravino told County Court that she was satisfied with her attorney.[1] The judge did not inform Gravino that she would have to register as a sex offender under the Sex Offender Registration Act (Correction Law art 6-C) as a consequence of her conviction.

When Gravino appeared for sentencing on September 14, 2007, she asked to "pull [her] plea back on the grounds of a conflict of interest with" her assigned counsel. She told the judge that she had experienced "nothing but misrepresentation," and complained that the attorney—who, she stated, had previously represented an ex-husband in "a custody battle against [her]"—had not interviewed potential witnesses. The judge responded "We went over that before, didn't we?" Gravino

---

1. Just before the *Huntley* hearing was to be held, the public defender's office, which was then representing Gravino, discovered a conflict with the complaining witness. The judge contacted an attorney who had previously handled felony cases in his court, and this attorney agreed to be Gravino's assigned counsel.

did not answer directly. Instead, she repeated that she felt as if she had been "misrepresented," and not "treated fairly." The prosecutor, when asked by the judge if he wished to comment on Gravino's application to withdraw her guilty plea, replied that the judge was "correct" and that the parties had "previously addressed this issue and covered it completely";[2] further, there were no "new grounds or new evidence" to "justify the withdrawal of the plea."

County Court denied Gravino's application. He advised her, however, that she could later move for postconviction relief, for which he would assign her new counsel. Next, the judge sentenced Gravino as promised. The clerk then brought up the sex offender registration fee of $50 and the supplemental sex offender fee of $1,000, which the judge imposed; and the prosecutor asked the judge to certify Gravino as a sex offender, which he did.

On appeal to the Appellate Division, Gravino argued that County Court should have conducted an inquiry after she moved to withdraw her guilty plea on conflict-of-interest grounds; and that her guilty plea was involuntary because the judge did not tell her that she would have to register as a sex offender. The court disagreed with Gravino. First, the Appellate Division held that County Court did not abuse its discretion because Gravino's "specifications of ineffective assistance concern[ed] matters outside the record [which] thus must be raised by way of a CPLR article 440 motion" (62 AD3d 1259, 1259 [4th Dept 2009] [internal quotation marks omitted]). Further, the court concluded that Gravino's "lack of awareness prior to sentencing" of the SORA registration requirement did not detract from her guilty plea's voluntariness (*id.*). A Judge of our Court granted Gravino leave to appeal (12 NY3d 925 [2009]), and we now affirm.

*Ellsworth*

By indictment filed on October 5, 2006, defendant Robert W. Ellsworth, Sr., who was then 39 years old, was charged with one count of course of sexual conduct against a child in the first degree (Penal Law § 130.75 [1] [a]) and one count of first-degree rape (Penal Law § 130.35 [3]), based on allegations that he sexually abused a young girl from the age of seven until she reported the abuse at the age of 10. On April 10, 2007, Ellsworth pleaded

2. Nothing in the record on appeal reflects any earlier discussions about assigned counsel's potential conflict of interest.

guilty to one count of course of sexual conduct against a child in the second degree (Penal Law § 130.80 [1] [a]) in exchange for a split sentence of six months in jail and 10 years of probation. At the time, Ellsworth resided with his girlfriend and several children (although not the alleged victim) younger than 18 years old. The judge did not mention any particular potential conditions of probation during the plea colloquy.

After his guilty plea and before sentencing, Ellsworth was interviewed by a probation officer for purposes of a presentence report, completed on June 1, 2007. During this interview, Ellsworth "asked about the ramifications of being classified as a sex offender and being around children under the age of [18], specifically, his own children [who] reside[d] with him." The probation officer told Ellsworth that he would be forbidden from associating with any child under the age of 18, even his own children, as a condition of probation. According to the probation officer, Ellsworth "questioned this," and so he advised him "to consult with his attorney so that a motion could be made before the court for consideration."

When Ellsworth appeared for sentencing on June 18, 2007, his attorney moved to withdraw the guilty plea and proceed to trial. Ellsworth's attorney also mentioned that the judge, with the prosecutor's consent, had offered Ellsworth an alternative sentence—two years in prison to be followed by two years of postrelease supervision—on June 11th, his originally scheduled sentencing date, and that Ellsworth had been given one week to consider this option.

Because the prosecutor who had handled the case was not present, County Court adjourned the sentencing hearing until June 25, 2007, and reserved on the motion. When Ellsworth appeared on that date, though, his attorney withdrew the motion, and indicated that the "6/10" split sentence originally promised Ellsworth was "what he want[ed] to do." When County Court asked Ellsworth if there was "anything [he] wanted to say on [his] own behalf," he only inquired as to whether he could serve his time in jail on weekends. He did not inquire about access to his minor children, or, for example, ask the judge for permission for supervised visits with them.

The judge then sentenced Ellsworth as promised, and handed him a written copy of the terms and conditions of his probation. This document, entitled "Order and Conditions of Adult Probation," ordered Ellsworth to comply with three general and 18

special conditions as well as "any others *which the Court may impose at a later date*" (emphasis added). Special Condition number eight states as follows: "Do not initiate, maintain or establish contact with any child under the age of 18, nor attempt to do so, nor reside in the same residence with minor children, without permission of the Court or your [probation officer]."

In November 2007, Ellsworth, represented by a new attorney, moved to vacate his judgment of conviction pursuant to Criminal Procedure Law § 440.10. In that motion, Ellsworth argued that his trial attorney had provided inadequate assistance by "fail[ing] to adequately investigate his case and defenses . . . [and] coerc[ing] him into accepting a . . . plea deal" that was "unwanted," apparently because he was prohibited from being around his minor children. Ellsworth also claimed to be innocent of the charges. The People argued that Ellsworth's conclusory assertions were insufficient to entitle him to relief. County Court agreed, and denied the motion without a hearing.

Ellsworth also appealed his judgment of conviction on the ground that his guilty plea was involuntary. A unanimous Appellate Division concluded, however, that his guilty plea was knowing, voluntary and intelligent (59 AD3d 989 [4th Dept 2009]). A Judge of our Court granted Ellsworth leave to appeal (12 NY3d 924 [2009]), and we now affirm.

## II.

The outcome of these appeals turns on the application of our precedent in *People v Ford* (86 NY2d 397 [1995]). There, we emphasized that a trial court may accept a guilty plea only after fulfilling its constitutional duty to "ensure that [the] defendant . . . has a full understanding of what the plea connotes and its consequences" (*id.* at 402-403). Although "the court is not required to engage in any particular litany when allocuting the defendant," due process mandates that " 'the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant' " (*id.* at 403, quoting *North Carolina v Alford*, 400 US 25, 31 [1970]).

Because "a criminal court is in no position to advise on all the ramifications of a guilty plea," though, we observed in *Ford* that courts have traditionally drawn a distinction between direct consequences of a guilty plea, of which a defendant must be apprised during the plea colloquy, and collateral consequences, which the trial judge may, but need not, mention (*id.*). Further, we defined a direct consequence as having "a

definite, immediate and largely automatic effect on [a] defendant's punishment" (*id.*, citing *Cuthrell v Director, Patuxent Inst.*, 475 F2d 1364 [4th Cir 1973], *cert denied* 414 US 1005 [1973]; *see also Brady v United States*, 397 US 742, 755 [1970] [voluntary guilty pleas are made "by one fully aware of the *direct consequences*, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel" (emphasis added and internal quotation marks omitted)]).

Thus, we held in *Ford* that "[t]he failure to warn of . . . collateral consequences will not warrant vacating a plea because they are peculiar to the individual and generally result from the actions taken by agencies the court does not control" (86 NY2d at 403). Specifically, we concluded that the trial court was under no duty to warn the defendant of the possibility of deportation before accepting his guilty plea[3] because "[d]eportation [was] a collateral consequence of conviction . . . peculiar to the individual's personal circumstances and one not within the control of the court system" (*id.*).[4]

We next considered our *Ford* precedent in *People v Catu* (4 NY3d 242 [2005]). Because Catu was a second felony offender,

---

3. In 1995, the same year we decided *Ford*, the Legislature adopted Criminal Procedure Law § 220.50 (7). This provision directs trial courts to advise non-citizen defendants, on the record, of certain potential consequences of a guilty plea related to their immigration status, but specifies that neglect to do so does not "affect the voluntariness of a plea of guilty or the validity of a conviction."

4. We also held in *Ford* that the failure of the defendant's attorney to warn him of the possibility of deportation as a result of his guilty plea did not state grounds for ineffective assistance of counsel under *Strickland v Washington* (466 US 668 [1984]), although we left open the possibility that affirmative misstatements by counsel might have done so (*Ford*, 86 NY2d at 405; *see also People v McDonald*, 1 NY3d 109, 111 [2003] ["(U)nder certain circumstances, a defense counsel's incorrect advice as to deportation consequences of a plea may constitute ineffective assistance of counsel"]). The United States Supreme Court just recently held, however, that the Sixth Amendment requires criminal defense attorneys to advise their immigrant clients of the deportation consequences of a guilty plea, although the "[l]ack of clarity in the law . . . will affect the scope and nature of counsel's advice" (*Padilla v Kentucky*, 559 US —, — n 10, 130 S Ct 1473, 1483 n 10 [2010]). The Court noted that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally reasonable professional assistance required under *Strickland*" (559 US at —, 130 S Ct at 1481 [internal quotation marks omitted]); however, "[w]hether that distinction [was] appropriate [was] a question" that the Court decided that it "need not consider" in *Padilla* since deportation had been "long recognized . . . [as] a particularly severe 'penalty,' [although] not, in a strict sense, a criminal sanction" and thus was "*uniquely difficult* to classify as either a direct or a collateral consequence" (559 US at —, 130 S Ct at 1481-1482 [citation omitted and emphasis added]).

his sentence for the crimes to which he pleaded guilty included a mandatory period of five years of postrelease supervision. The trial judge did not inform Catu of this obligation during the plea colloquy. As a result, Catu subsequently sought to vacate his guilty plea on the ground that postrelease supervision was a direct, rather than a collateral, consequence of his conviction, which the judge was therefore required to make known to him before accepting his guilty plea.

We agreed. We noted that postrelease supervision was a component of a sentence, and "[w]hereas the term of supervision to be imposed [might] vary depending on the degree of the crime and the defendant's criminal record, imposition of supervision [was] mandatory and thus 'ha[d] a definite, immediate and largely automatic effect on [a] defendant's punishment' " (*id.* at 244, quoting *Ford*, 86 NY2d at 403). We recognized that postrelease supervision was "significant" in light of the conditions to which a defendant might be subject after release from prison—e.g., curfew, travel restrictions, substance abuse testing and treatment, residential treatment— and the risk of reincarceration for disobedience of release conditions (*id.* at 245).

We therefore concluded that "a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action"; and decided that the trial court's failure to advise Catu of his obligation to serve a five-year term of postrelease supervision required reversal of his conviction (*id.*). Further, although the trial court and the Appellate Division had both engaged in harmless-error analysis, "refus[ing] . . . to vacate [Catu's] plea on the ground that he did not establish that he would have declined to plead guilty had he known of the postrelease supervision" (*id.*), we specifically rejected this approach (*cf.* n 6, *infra* at 557-558).

### III.

#### Gravino

Gravino protests that she "was not informed that she was required to register as a sex offender until she was being led away to prison following her sentencing"; and therefore her guilty plea was not knowing, voluntary and intelligent. She argues that SORA registration, like postrelease supervision, "should fall within the realm of a 'direct' consequence" of a

guilty plea, principally "because of the ramifications of being identified as a sex offender." She contrasts the "abbreviated periods" of postrelease supervision with the SORA requirement for annual registration and verification for a minimum period of 20 years (level one sex offenders) to a maximum period of lifetime (levels two and three sex offenders) (Correction Law § 168-h), subject to felony penalties for failure to comply (Correction Law § 168-t).

Postrelease supervision, however, is, by statute, a component element of a sentence, which is why a judge must pronounce the period of postrelease supervision at sentencing (*see People v Sparber*, 10 NY3d 457, 469 [2008]); it is thus an integral part of the punishment meted out upon a defendant's conviction of a crime. By contrast, we have observed that SORA "is *not a penal statute* and *the registration requirement is not a criminal sentence.* Rather than imposing punishment for a past crime, SORA is *a remedial statute* intended to prevent future crime" (*Matter of North v Board of Examiners of Sex Offenders of State of N.Y.*, 8 NY3d 745, 752 [2007] [citation omitted and emphases added]).

Similarly, we have held that "*a SORA risk-level determination is not part of a defendant's sentence*[;] . . . it is *a collateral consequence of a conviction* for a sex offense *designed not to punish*, but rather to protect the public" (*People v Windham*, 10 NY3d 801, 802 [2008] [citations omitted and emphases added]). The extent and nature of the conditions imposed on a SORA registrant—i.e., the consequences of SORA registration—turn upon the risk classification. The Board of Examiners of Sex Offenders, an administrative agency, recommends a released offender's risk classification based on the SORA Guidelines (Correction Law § 168-*l*), subject to judicial determination (Correction Law § 168-n). These consequences are not known at the time a court accepts a guilty plea, and therefore cannot have a " 'definite, immediate and largely automatic effect on [a] defendant's punishment' " (*Catu*, 4 NY3d at 244, quoting *Ford*, 86 NY2d at 403).

▮ Unquestionably, SORA imposes significant burdens on a registrant, regardless of risk level. But we have consistently held that SORA requirements, unlike postrelease supervision, are not part of the punishment imposed by the judge; rather, SORA registration and risk-level determinations are nonpenal consequences that result from the fact of conviction for certain

crimes.[5] Thus, SORA registration is not a "direct consequence" of a conviction within the meaning of *Ford* as interpreted in *Catu*. Indeed, "virtually every . . . jurisdiction to address the question" has likewise concluded that sex offender registration is a collateral consequence of a guilty plea (*see Magyar v State*, 18 So 3d 807, 812 and n 5 [Miss 2009] [gathering cases]; *see also State v Bollig*, 232 Wis 2d 561, 571-573, 605 NW2d 199, 203-204 [2000] ["Of the states that have addressed whether registration of sex offenders is punishment, all but one . . . answered in the negative.[6] Despite variations . . . statutes in

---

**5.** The dissent treats all consequences of conviction as punishment (*see* dissenting op at 562 ["(L)ike postrelease supervision, the certification that a defendant is a sex offender . . . is a definite, immediate and . . . automatic effect of a defendant's conviction" (internal quotation marks omitted)]), thus obliterating the distinction between direct and collateral consequences. As an initial matter, "certification," a duty of the court, is not the same as "registration," an obligation imposed on a defendant. At sentencing, the trial judge must certify that a defendant convicted of a crime listed in the statute is a sex offender (*see* Correction Law § 168-d [1] [a]). If the sex offense includes a special factor, such as the age of the complainant, and the defendant challenges either the factor or an allegation that he has previously been convicted of a sexual offense or a sexually violent offense, the judge, prior to certification, must hold a hearing without a jury to determine whether the factor or the allegation is proven by clear and convincing evidence (Correction Law § 168-d [1] [b], [c]). Upon certification, either with or without a hearing, the judge must notify the defendant of the duty to register (Correction Law § 168-d [1] [a]). Further, although SORA registration is a consequence of a conviction of certain crimes, so is the possibility of deportation, or, as we mentioned in *Ford*, the "loss of the right to vote or travel abroad, loss of civil service employment, loss of a driver's license, loss of the right to possess firearms or an undesirable discharge from the Armed Services" (86 NY2d at 403 [citations omitted]). These consequences, like SORA registration, are all collateral rather than direct because they do not have a " 'definite, immediate and largely automatic effect on [a] defendant's *punishment*' " (*Catu*, 4 NY3d at 244, quoting *Ford*, 86 NY2d at 403 [emphasis added]; *cf.* dissenting op at 560).

**6.** California is the outlier (*see Bunnell v Superior Ct.*, 13 Cal 3d 592, 605, 531 P2d 1086, 1094 [1975] ["In all guilty plea and submission cases the defendant shall be advised of the direct consequences of conviction such as the permissible range of punishment provided by statute, registration requirements (including sex offender registration), if any, and, in appropriate cases the possibility of commitment (for narcotics addiction)" (citations omitted)]). A defendant is not automatically entitled to withdraw a guilty plea when a California trial court fails to advise of a sex offender registration requirement, though. First, absent a timely objection, a defendant waives the claim of error (*see People v McClellan*, 6 Cal 4th 367, 377, 862 P2d 739, 746 [1993] [where defense counsel was aware of probation officer's report recommending that defendant register as a sex offender, filed 11 days before the sentencing hearing, "defendant waived his claim of error by failing at the sentencing hearing to interpose a timely objection to the registration requirement"]). Second,

most states are remarkably similar. That is because most state statutes have the same genesis and are versions of Megan's Law"]). Finally, as the Appellate Division pointed out, Gravino's claim of ineffective assistance of counsel brings up matters not apparent from the face of the record, which are therefore properly fleshed out by affidavit in support of a CPL 440.10 motion rather than raised on direct appeal.

### Ellsworth

Ellsworth, a level three sex offender, argues that County Court's "authority to exercise control over [his] ability to have contact with [his] children" is a direct consequence of his guilty plea within the meaning of *Ford* and the holding of *Catu*. He therefore faults the judge for not informing him during the plea colloquy that he "would lose the fundamental right to have any contact, or live with" his young children.

But courts taking guilty pleas cannot be expected to predict any and every potential condition of probation that might be recommended in the presentence report—an impossible task given the individualized nature of probation supervision. Here, as noted earlier, the judge ultimately imposed three general and 18 special conditions of probation. Moreover, these conditions may be modified or enlarged by the court at any time before the expiration or termination of the period of probation (CPL 410.20 [1]). Indeed, one of the special conditions acknowledges the judge's discretion to require Ellsworth to comply with unspecified additional conditions later on. Accepting Ellsworth's argument would convert every plea colloquy where probation is part of the sentence into a conjectural and contingent exercise, potentially requiring at least partial reallocation at sentencing; it might also create a disincentive for the offender to cooperate fully with the preparer of the presentence report, lest more onerous conditions than those provisionally identified be recommended.

In *Catu* we held that postrelease supervision is a direct consequence of a conviction, and therefore a defendant must be advised of the fact and length of postrelease supervision during the plea colloquy in order for a guilty plea to be knowing, voluntary and intelligent. We did not suggest that the judge was required to speculate on the conditions to which a defendant

even where the claim of error is not waived, a defendant must establish prejudice—i.e., that he would not have pleaded guilty but for the trial court's omission (*McClellan*, 6 Cal 4th at 378, 862 P2d at 746-747; *see also People v Picklesimer*, 48 Cal 4th 330, 344-345, 226 P3d 348, 358 [2010]).

might be subject after release from prison. Likewise, it was sufficient here that Ellsworth was made aware during the plea colloquy that his sentence would include a 10-year period of probation.

■ We decide today that SORA registration and the terms and conditions of probation are not direct consequences of a plea—in other words, that the judge's failure to mention them does not, by itself, demonstrate that a plea was not knowing, voluntary and intelligent. It does not necessarily follow, though, that nondisclosure is always irrelevant to the question of whether a court should exercise its discretion to grant a motion to withdraw a plea. There may be cases in which a defendant can show that he pleaded guilty in ignorance of a consequence that, although collateral for purposes of due process, was of such great importance to him that he would have made a different decision had that consequence been disclosed.

As the record demonstrates, neither of the cases before us fits this description, and indeed such cases will be rare. Undoubtedly, in the vast majority of plea bargains the overwhelming consideration for the defendant is whether he will be imprisoned and for how long. But it may occasionally happen that a defendant, moving to withdraw his plea promptly after disclosure of the facts in question, can convincingly show that the newly discovered information, if known at the time of the plea, would have caused a change of heart. Where that is true, the motion to withdraw the plea will not be defeated simply by labeling a consequence "collateral."

Accordingly, the orders of the Appellate Division should be affirmed in both of these cases.

CIPARICK, J. (dissenting). Because I believe that Sex Offender Registration Act (SORA) certification and subsequent registration and the restriction of contact with one's children as a condition of probation are direct consequences of a guilty plea of which a defendant must be informed to make that plea knowing, voluntary and intelligent, I respectfully dissent.

To be valid, a defendant's guilty plea must be knowing, voluntary and intelligent (*see People v Catu*, 4 NY3d 242, 245 [2005]). In order to constitute a knowing, voluntary and intelligent plea, the trial court has a duty to ensure that a defendant is aware of the direct consequences of such plea (*see id.* at 244-245; *see also People v Boyd*, 12 NY3d 390, 393 [2009]; *People v Ford*, 86 NY2d 397, 403 [1995]). Accordingly, a trial court may permit a

defendant to plead guilty only after the court first ensures "that a defendant . . . has a full understanding of what the plea connotes and its consequences" (*Ford*, 86 NY2d at 402-403). However, a trial court has no duty to inform a defendant of *collateral* consequences of a guilty plea (*see Catu*, 4 NY3d at 244). We have defined a "collateral consequence" as one which is "peculiar to the individual [defendant] and generally result[s] from the actions taken by agencies the court does not control" (*id.*, quoting *Ford*, 86 NY2d at 403). On the other hand, a "direct consequence" is "one which has a definite, immediate and largely automatic effect on defendant's punishment" (*id.*).

In *Catu*, we concluded that postrelease supervision (PRS) was a direct consequence of a conviction which must be disclosed to a defendant in order to render a guilty plea knowing, voluntary and intelligent. We explained:

> "Postrelease supervision is a direct consequence of a criminal conviction. In eliminating parole for all violent felony offenders in 1998, the Legislature enacted a scheme of determinate sentencing to be followed by periods of *mandatory* postrelease supervision, and defined each determinate sentence to also include, as a part thereof, an additional period of post-release supervision. Whereas *the term of supervision to be imposed may vary depending on the degree of the crime and the defendant's criminal record*, imposition of supervision is mandatory and thus has a definite, immediate and largely automatic effect" (4 NY3d at 244 [citations, internal quotation marks and brackets omitted; emphasis added]).

We also observed that PRS can have onerous terms including, but not limited to, a curfew, travel restrictions, and substance abuse treatment and/or testing. Moreover, we noted that a "violation of a condition of postrelease supervision can result in reincarceration for at least six months and up to the balance of the remaining supervision period" (*id.* at 245 [citations omitted]).

Under the rubric we set forth in *Ford* and further explained in *Catu*, SORA registration is a direct consequence of defendant Gravino's guilty plea. The majority insists that SORA registration is not a direct consequence because we have held that it is "not part of the punishment imposed by the judge" (*see* majority op at 556). Moreover, the majority differentiates postrelease supervision from SORA registration on the ground that

postrelease supervision "is, by statute, a component element of a sentence" (*id.* at 556, citing *People v Sparber*, 10 NY3d 457, 469 [2008]). We have never held that a consequence of a criminal conviction must be a component of a defendant's sentence in order to constitute a direct consequence thereof (*see Ford*, 86 NY2d at 403; *Catu*, 4 NY3d at 244-245). Instead, we have held that direct consequences must have an effect on a defendant's punishment. As a result, the majority's stance cannot be reconciled with our holdings in *Ford* and *Catu*.[1]

Although the *terms* of SORA registration will vary depending on the level of classification, the *imposition* of SORA certification—leading to mandatory compliance with SORA requirements—is, like PRS, mandatory. Significantly, in this regard, Correction Law § 168-d (1) (a) states: "[U]pon conviction . . . the court *shall* certify that the person is a sex offender and *shall* include the certification in the order of commitment" (emphasis added). The statute requires that the trial court "*shall* also advise the sex offender of his or her duties under this article" (emphasis added). Although a SORA risk-level determination has been held to be not part of a sentence, we have concluded that the trial court's mandatory certification that a

---

1. The United States Supreme Court recently considered whether an attorney's failure to advise a client of a consequence we deemed "collateral" in *Ford*—deportation—could constitute ineffective assistance of counsel sufficient to warrant the vacatur of a guilty plea (*see Padilla v Kentucky*, 559 US —, 130 S Ct 1473 [2010]). The Court concluded that a defense attorney does have a duty to advise his or her client that deportation is a possible consequence (*see* 559 US at —, 130 S Ct at 1482). Significantly, in determining whether the direct/collateral consequence dichotomy was useful to determine whether deportation advice was required, the Court stated

> "[a]lthough removal proceedings are civil in nature, deportation is nevertheless *intimately related to the criminal process*. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it *most difficult to divorce the [civil] penalty from the conviction in the deportation context*" (559 US at —, 130 S Ct at 1481 [citations and internal quotation marks omitted; emphasis added]).

While it is true that *Padilla* dealt with the duty of counsel, rather than the duty of the courts, to inform a criminal defendant about deportation, the rationale employed by the Court in rejecting the direct/collateral consequence dichotomy applies with equal force in determining the voluntariness of a guilty plea where the court has failed to advise the defendant of SORA registration, which is also a civil penalty "difficult to divorce . . . from [a] conviction" (559 US at —, 130 S Ct at 1481 [internal quotation marks omitted]).

defendant is a sex offender is an appealable and reviewable part of the judgment of conviction (*People v Hernandez*, 93 NY2d 261, 267 [1999]). Thus, like postrelease supervision, the certification that a defendant is a sex offender—and, accordingly, subject to the requirements of SORA—is "a definite, immediate and . . . automatic effect" of a defendant's conviction (*Catu*, 4 NY3d at 244 [citation and internal quotation marks omitted]).[2] While it is true that we have held that the particular *risk-level determination* made for a specific defendant is a collateral consequence not subject to attack on direct appeal from a judgment of conviction (*see People v Windham*, 10 NY3d 801, 802 [2008]), here defendant challenges not the specific risk-level determination but the fact that she was certified a sex offender subject to SORA requirements.

Moreover, as the majority recognizes (*see* majority op at 556), the consequences of SORA registration are "significant" (*Catu*, 4 NY3d at 245) and can include up to, for a level two or three offender, lifetime registration (*see* Correction Law § 168-h [2]), verification of address every 90 days (*see* § 168-h [3] [level three offenders]) with fees to be paid by the sex offender for each change of address (*see* § 168-b [8]), and the dissemination to the public of the sex offender's personal information via the Internet (*see* § 168-q [1]). Even sex offenders posing the lowest risk (level one) are subject to annual registration and residency verification for a period of 20 years (§ 168-h [1]). As with postrelease supervision, failure to comply with the requirements of SORA can result in a felony conviction (*see* § 168-t).

In short, Gravino's certification as a sex offender was an automatic and immediate consequence of her conviction for rape in the third degree. Thus, I would hold that sex-offender certification is a direct consequence of Gravino's guilty plea and, without informing Gravino that she would be subject to SORA certification, her guilty plea cannot be said to "represent[ ] a voluntary and intelligent choice among the alternative

2. Although the majority accuses the dissent of "treat[ing] all consequences of conviction as punishment," thereby "obliterating the distinction between direct and collateral consequences" (majority op at 557 n 5), I do not intend to "obliterate" any distinction. Rather, I believe that SORA certification and the resulting mandatory compliance with SORA requirements fall squarely within the ambit of "direct consequences" of a judgment of conviction, as we explained that term in *Ford* and *Catu*. Other consequences not relevant here may very well remain collateral (*cf. Padilla*, 559 US at —, 130 S Ct at 1481).

courses of action open to" her (*North Carolina v Alford*, 400 US 25, 31 [1970]).

Similarly, I would hold that a condition of probation that prohibits defendant Ellsworth from living with his children is a most significant and direct consequence of his guilty plea. I agree with the majority that "courts taking guilty pleas cannot be expected to predict any and every potential condition of probation that might be recommended in the presentence report" (majority op at 558). It is hardly unforeseeable, however, that upon a conviction for course of sexual conduct against a child in the second degree, defendant would be forbidden, as a term of his probation, from living with or having contact with children, including his own. Indeed, the record reflects that both the presentence interviewer and the prosecutor believed such a condition to be a mandatory component of defendant's probation. Thus, it does not appear that the particular condition at issue was "peculiar to the individual" defendant (*see Ford*, 86 NY2d at 403). Moreover the condition that defendant not live with or have contact with children was "within the control of" the sentencing court (*id.*), as that court had it within its discretion to adjust the conditions imposed.

We have repeatedly recognized that parents' interest in the care and custody of their children is a fundamental right (*see Matter of Tammie Z.*, 66 NY2d 1, 4 [1985], citing *Matter of Ella B.*, 30 NY2d 352, 356 [1972]; *see also Santosky v Kramer*, 455 US 745, 758-759 [1982]). Accordingly, I would hold that where a defendant, as a direct consequence of his plea, is stripped of that right as a largely automatic condition of a sentence imposed for a sex crime involving children, the defendant must be informed of that direct consequence in order to render the guilty plea knowing, voluntary and intelligent, and County Court's failure to do so here rendered Ellsworth's plea invalid.

Accordingly, in both cases, I would reverse the order of the Appellate Division and remit to the sentencing courts for further proceedings.

Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN and Judge JONES concur.

In each case: Order affirmed.