[3 NE3d 617, 980 NYS2d 280]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUAN JOSE PEQUE, Also Known as JUAN JOSE PEQUE SICAJAN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD DIAZ, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL THOMAS, Also Known as NEIL ADAMS, Appellant.

Argued September 11, 2013; decided November 19, 2013

## POINTS OF COUNSEL

*Melissa A. Latino*, Albany, for appellant in the first above-entitled action. I. Given that the trial court, as well as defense counsel, failed to properly advise appellant of the consequences of deportation prior to his plea of guilty, appellant did not enter a knowing, voluntary and intelligent plea. (*People v Santalucia*, 9 AD3d 740; *People v Ford*, 86 NY2d 397; *People v Fitzgerald*, 65 AD3d 747; *Padilla v Kentucky*, 559 US 356; *People v Marshall*, 66 AD3d 1115; *People v McDonald*, 1 NY3d 109.) II. Appellant did not receive effective assistance of counsel granted him pursuant to the Sixth Amendment to the United States Constitution. (*People v Eastman*, 85 NY2d 265; *United States v Orocio*, 645 F3d 630; *Strickland v Washington*, 466 US 668; *People v Nunez*, 30 Misc 3d 55; *People v Reynoso*, 88 AD3d 1162; *People v Garcia*, 29 Misc 3d 756; *Hill v Lockhart*, 474 US 52; *McMann v Richardson*, 397 US 759.) III. Appellant's sentence was unduly harsh and excessive, especially in light of deportation.

*Weeden A. Wetmore, District Attorney*, Elmira (*Susan Rider-Ulacco* of counsel), for respondent in the first above-entitled action. I. The trial court properly accepted defendant's guilty plea. (*People v Toxey*, 86 NY2d 725, 839; *People v Lopez*, 71 NY2d 662; *People v Lopez*, 6 NY3d 248; *People v Seaberg*, 74 NY2d 1; *People v Ford*, 86 NY2d 397; *People v Owusu*, 93 NY2d 398;

*People v Finnegan*, 85 NY2d 53; *People ex rel. Harris v Sullivan*, 74 NY2d 305; *People v Heine*, 9 NY2d 925; *Bright Homes v Wright*, 8 NY2d 157.) II. Defendant received the effective assistance of counsel. (*People v Rivera*, 71 NY2d 705; *People v Droz*, 39 NY2d 457; *People v Baldi*, 54 NY2d 137; *People v Benevento*, 91 NY2d 708; *People v Jackson*, 48 AD3d 891, 10 NY3d 841; *Strickland v Washington*, 466 US 668; *People v Harnett*, 16 NY3d 200.) III. Defendant's sentence was neither harsh nor excessive. (*People v Thompson*, 60 NY2d 513; *People v Rytel*, 284 NY 242; *People v Potskowski*, 298 NY 299.)

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Rosemary Herbert* of counsel), for appellant in the second above-entitled action. I. Where the trial court failed to warn Richard Diaz that he would be automatically deported as a consequence of his conviction, his guilty plea was not knowing, intelligent and voluntary. (*Matter of Chaipis v State Liq. Auth.*, 44 NY2d 57; *Brady v United States*, 397 US 742; *Boykin v Alabama*, 395 US 238; *Kercheval v United States*, 274 US 220; *People v Harris*, 61 NY2d 9; *People v Nixon*, 21 NY2d 338; *North Carolina v Alford*, 400 US 25; *People v Ford*, 86 NY2d 397; *People v Gravino*, 14 NY3d 546.) II. Where the only information regarding the immigration consequences of Richard Diaz's guilty plea was inaccurate and misleading, Mr. Diaz's guilty plea was not knowing, intelligent and voluntary. (*Matter of Chaipis v State Liq. Auth.*, 44 NY2d 57; *North Carolina v Alford*, 400 US 25; *People v Harris*, 61 NY2d 9; *Zhang v United States*, 506 F3d 162; *People v Gravino*, 14 NY3d 546.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Vincent Rivellese* and *Hilary Hassler* of counsel), for respondent in the second above-entitled action. Defendant's guilty plea was knowing, intelligent and voluntary; *Padilla v Kentucky* (559 US 356 [2010]) does not impose new duties upon trial courts taking guilty pleas, and the court in this case did not misinform defendant about the immigration consequences of his plea. (*People v Fiumefreddo*, 82 NY2d 536; *People v Francis*, 38 NY2d 150; *People v Nixon*, 21 NY2d 338; *People v Harris*, 61 NY2d 9; *People v Harnett*, 16 NY3d 200; *People v Gravino*, 14 NY3d 546; *People v Ford*, 86 NY2d 397; *Matter of Randall v Rothwax*, 161 AD2d 70, 78 NY2d 494; *People v Lopez*, 71 NY2d 662.)

*Lynn W.L. Fahey, Appellate Advocates*, New York City, for appellant in the third above-entitled action. I. The court failed to establish that appellant pleaded guilty knowingly, intelligently,

and voluntarily when, despite appellant's statement that he was not a United States citizen, it failed to inform him that his plea could have adverse immigration consequences. (*Padilla v Kentucky*, 559 US 356; *People v Callahan*, 80 NY2d 273; *People v Hansen*, 95 NY2d 227; *People v Seaberg*, 74 NY2d 1; *Fong Haw Tan v Phelan*, 333 US 6; *Delgadillo v Carmichael*, 332 US 388; *Ng Fung Ho v White*, 259 US 276; *Galvan v Press*, 347 US 522; *Klapprott v United States*, 335 US 601; *Bridges v Wixon*, 326 US 135.) II. Appellant was entitled to a hearing on his claim that he was denied his Sixth Amendment right to the effective assistance of counsel by his attorney's failure to inform him of the immigration consequences of his guilty plea. (*People v Ford*, 86 NY2d 397; *Padilla v Kentucky*, 559 US 356; *Strickland v Washington*, 466 US 668; *Jones v Barnes*, 463 US 745; *Hill v Lockhart*, 474 US 52; *McMann v Richardson*, 397 US 759; *Von Moltke v Gillies*, 332 US 708; *INS v St. Cyr*, 533 US 289; *Libretti v United States*, 516 US 29; *Matter of Kelvin D.*, 40 NY2d 895.)

*Richard A. Brown, District Attorney*, Kew Gardens (*Jennifer Hagan, Robert J. Masters* and *John M. Castellano* of counsel), for respondent in the third above-entitled action. I. Defendant forfeited his right to rely on any change in the law that occurred after the date of his initial fraud on the plea court. (*Padilla v Kentucky*, 559 US 356; *People v Avila*, 177 AD2d 426; *United States v Campbell*, 778 F2d 764; *People v Ford*, 86 NY2d 397; *Fruchtman v Kenton*, 531 F2d 946; *United States v Russell*, 686 F2d 35; *United States v Mastrangelo*, 693 F2d 269; *People v Geraci*, 85 NY2d 359; *Reynolds v United States*, 98 US 145.) II. The Appellate Division correctly held that the lower court was not required to advise defendant about the potential immigration consequences of his guilty plea. (*Padilla v Kentucky*, 559 US 356; *INS v St. Cyr*, 533 US 289; *Boykin v Alabama*, 395 US 238; *People v Hill*, 9 NY3d 189; *Brady v United States*, 397 US 742; *People v Harnett*, 16 NY3d 200; *People v Ford*, 86 NY2d 397; *People v Avila*, 177 AD2d 426; *United States v Campbell*, 778 F2d 764.) III. Defendant's claim that his attorney failed to advise him of the potential immigration consequences of his plea is based on matters dehors the record and, in any event, the Appellate Division correctly held that the lower court properly denied defendant's motion to withdraw his plea without a hearing. (*People v Cass*, 18 NY3d 553; *People v Kim*, 91 NY2d 407; *People v Brown*, 14 NY3d 113; *People v Fiumefreddo*, 82 NY2d 536; *People v Baret*, 11 NY3d 31; *People v Tinsley*, 35 NY2d 926; *People v Frederick*, 45 NY2d 520; *People v Ramos*, 63 NY2d 640; *People v Gruden*, 42 NY2d 214; *People v Avila*, 177 AD2d 426.)

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Craig L. Siegel, Carl D. Duffield, Ashley S. Miller* and *Anna K. Ostrom* of counsel), and *Dawn Seibert* for Immigrant Defense Project, amicus curiae in the first, second and third above-entitled actions. I. Significant changes in the law justify the Court reexamining and overruling *People v Ford* (86 NY2d 397 [1995]). (*People v Taylor*, 9 NY3d 129; *People v Bing*, 76 NY2d 331; *People v Hobson*, 39 NY2d 479; *Bing v Thunig*, 2 NY2d 656; *Helvering v Hallock*, 309 US 106; *People v Damiano*, 87 NY2d 477; *People v Berrios*, 28 NY2d 361; *People v Ressler*, 17 NY2d 174; *United States v Parrino*, 212 F2d 919; *Padilla v Kentucky*, 559 US 356.) II. Deportation has become a sufficiently definite, immediate, and largely automatic consequence of conviction that trial courts should be constitutionally required to notify noncitizens about its possibility before accepting a plea of guilty to a felony offense. (*Padilla v Kentucky*, 559 US 356; *People v Ford*, 86 NY2d 397; *United States v Graham*, 169 F3d 787; *Brooks v Holder*, 621 F3d 88; *Vargas-Sarmiento v United States Dept. of Justice*, 448 F3d 159; *Perez v Greiner*, 296 F3d 123; *United States v Fernandez-Antonia*, 278 F3d 150; *Mugalli v Ashcroft*, 258 F3d 52; *Fuentes-Cruz v Gonzales*, 489 F3d 724.) III. Due process requires automatic vacatur of a plea-based conviction where a trial court fails to notify a noncitizen defendant about the possibility of deportation. (*People v Van Deusen*, 7 NY3d 744; *People v Coles*, 62 NY2d 908; *People v Grant*, 45 NY2d 366; *People v Crimmins*, 36 NY2d 230; *United States v Akinsade*, 686 F3d 248; *People v Ford*, 86 NY2d 397; *Brady v United States*, 397 US 742; *Strickland v Washington*, 466 US 668; *Zhang v United States*, 506 F3d 162.)

## OPINION OF THE COURT

ABDUS-SALAAM, J.

In these criminal appeals, we are called upon to decide whether, prior to permitting a defendant to plead guilty to a felony, a trial court must inform the defendant that, if the defendant is not a citizen of this country, he or she may be deported as a result of the plea. Our resolution of this issue is grounded in the right to due process of law, the bedrock of our constitutional order. That guarantee, most plain in its defense of liberty yet complex in application, requires us to strike a careful balance between the freedom of the individual and the orderly administration of government.

Upon review of the characteristics of modern immigration law and its entanglement with the criminal justice system, a

majority of this Court, consisting of Chief Judge Lippman, Judges Graffeo, Read, Rivera and me, finds that deportation is a plea consequence of such tremendous importance, grave impact and frequent occurrence that a defendant is entitled to notice that it may ensue from a plea. We therefore hold that due process compels a trial court to apprise a defendant that, if the defendant is not an American citizen, he or she may be deported as a consequence of a guilty plea to a felony.[1] In reaching this conclusion, we overrule the limited portion of our decision in *People v Ford* (86 NY2d 397 [1995]) which held that a court's failure to advise a defendant of potential deportation never affects the validity of the defendant's plea. However, a separate majority, consisting of Judges Graffeo, Read, Smith and me, reaffirms the central holding of *Ford* regarding the duties of a trial court and the distinction between direct and collateral consequences of a guilty plea, and we make clear that our precedent in this area is not otherwise affected by today's decision. Judges Graffeo, Read, Smith and I further hold that, in light of the Court's conclusion that a trial court must notify a pleading noncitizen defendant of the possibility of deportation, the trial court's failure to provide such advice does not entitle the defendant to automatic withdrawal or vacatur of the plea. Rather, to overturn his or her conviction, the defendant must establish the existence of a reasonable probability that, had the court warned the defendant of the possibility of deportation, he or she would have rejected the plea and opted to go to trial (*see* n 1, *supra*).[2]

---

**1.** Judge Pigott, in an opinion joined by Judge Smith, dissents from the Court's due process holding and concludes that a defendant has only a Sixth Amendment right to advice from counsel concerning deportation, but does not have a due process entitlement to a warning about the possibility of deportation from the trial court (*see* dissenting in part op at 204-205). While Judge Smith agrees with Judge Pigott that the court's failure to warn a defendant about the possibility of deportation does not implicate due process, he nonetheless agrees with Judges Graffeo, Read and me to the extent that, if this were indeed a failure to mention a particularly unique and significant plea consequence in violation of a due process obligation as described by the Court today, the appropriate remedy would be remittal to the trial court to afford the defendant an opportunity to demonstrate prejudice and not automatic vacatur of the plea. Thus, Judge Smith concurs that, given the majority's view that there has been a due process violation, the appropriate remedy in *People v Diaz* is a remittal to allow defendant to show prejudice.

**2.** In a dissenting opinion in which Judge Rivera largely concurs, Chief Judge Lippman determines that *Ford*'s analytical framework regarding plea

I

Because the disposition of these appeals varies with the facts of each one, I begin by reviewing the factual background and procedural history of each case.

*People v Peque*

Shortly after midnight on June 20, 2009, defendant Peque, a native of Guatemala, was arrested for allegedly raping a bartender in a bathroom stall at an inn. Defendant was later indicted on one count of rape in the first degree (*see* Penal Law § 130.35 [1]). At arraignment, defendant told the court that he was from Guatemala City and lacked a Social Security number, and during their bail application, the People informed the court that, in prison, defendant had made statements indicating he was in the United States unlawfully.

After a series of later court appearances and plea negotiations, defendant pleaded guilty to first-degree rape in exchange for a promised sentence of a 17$^{1}$/$_{2}$-year determinate prison term to be followed by five years of postrelease supervision. Defendant indicated that he had discussed his plea with his attorney, and when the court asked defendant, "Is there anything at this point in the process that you do not understand," he replied, via an interpreter, "No, everything is clear." The court accepted defendant's guilty plea without advising him that his first-degree rape conviction might result in his deportation because it qualified as a conviction for an "aggravated felony" under federal immigration statutes (*see* 8 USC §§ 1101 [a] [43] [A]; 1227 [a] [2]).

At sentencing, the court asked defense counsel whether there was "any legal reason sentence should not be pronounced," and counsel responded, "Not that I'm aware, Judge." Counsel then stated for the record that defendant was "subject to deportation following the completion of his sentence" and that counsel nonetheless wished for the court "to ratify the sentence as agreed upon." Counsel also mentioned that he had informed defendant of his "right of access to the Guatemalan consulate," which defendant had declined to exercise. Defendant, in turn, said, "I

consequences does not apply to deportation, and that a trial court's failure to warn a defendant that deportation may result from his or her guilty plea mandates automatic vacatur of the plea without any showing of prejudice (*see* dissenting op at 208-210). In a separate opinion, Judge Rivera expresses the same view, but joins the Court's disposition of defendant Thomas's appeal (*see* op of Rivera, J., at 218-219).

will ask your Honor to have mercy and allow me to be deported to my country within five years." Noting that it had no control over the immigration process, the court sentenced defendant as promised.

Defendant appealed, asserting that his guilty plea was not knowing, intelligent and voluntary because the trial court had not mentioned the possibility of deportation at the time of the plea. Defendant also claimed that his lawyer had been ineffective for not apprising him that he could be deported if he pleaded guilty. The Appellate Division affirmed defendant's conviction (88 AD3d 1024, 1024-1025 [3d Dept 2011]). Relying on *Ford*, the Appellate Division found that "[i]nasmuch as a defendant's potential for deportation is considered a collateral consequence of a criminal conviction, County Court's failure to advise defendant of such consequence does not render the plea invalid" (88 AD3d at 1025). The Court rejected defendant's ineffective assistance of counsel claim as unreviewable because it "involves matters largely outside of the record and is more appropriately addressed by a CPL article 440 motion" (*id.*). A Judge of this Court granted defendant leave to appeal (19 NY3d 977 [2012]), and we now affirm.

## People v Diaz

On the night of October 11, 2006, defendant Diaz, who was a legal permanent resident of the United States originally from the Dominican Republic, was allegedly riding in the back of a taxicab with codefendant Castillo Morales. Police officers stopped the cab and, after searching the back seat, recovered a bag containing a two-pound brick of cocaine. The officers arrested defendant and Morales, and thereafter, both men were indicted on one count of criminal possession of a controlled substance in the first degree (*see* Penal Law § 220.21 [1]) and one count of criminal possession of a controlled substance in the third degree (*see* Penal Law § 220.16 [1]).

At a court appearance held for consideration of the People's bail application, defense counsel opposed setting bail, noting that defendant was not a flight risk because he had a green card. Later, immediately prior to the scheduled start of a suppression hearing, defendant agreed to accept the People's plea offer of a 2½-year determinate prison term plus two years of postrelease supervision in exchange for his plea of guilty to third-degree drug possession. After conducting a standard plea allocution, the court said, "And if you're not here legally or if you have any immigration issues these felony pleas could

adversely affect you," adding, "Do you each understand that?" Defendant replied, "Yes." At sentencing, the court imposed the negotiated sentence. At no point did the court state that defendant could be deported based on his conviction of a removable controlled substances offense (*see* 8 USC § 1227 [a] [2] [B] [i]).

Defendant completed his prison term, and upon his release to postrelease supervision, United States Immigration and Customs Enforcement (ICE) initiated proceedings to remove him from the country based on his drug conviction. ICE initially detained defendant pending the outcome of those proceedings. However, defendant appealed his conviction and challenged the validity of his guilty plea, alleging that the court's failure to warn him of the possibility of deportation rendered his plea involuntary. As a result, ICE conditionally released defendant pending the resolution of his appeal, and he completed his term of postrelease supervision. While his appeal was pending, defendant also moved, pursuant to CPL 440.10, to vacate his conviction on the ground that his attorney had been ineffective for failing to advise him of the immigration consequences of his guilty plea. After a hearing, Supreme Court denied that motion, and the Appellate Division subsequently denied defendant permission to appeal from the hearing court's decision.

On defendant's direct appeal, the Appellate Division affirmed his conviction (92 AD3d 413, 413-414 [1st Dept 2012]). The Court found that defendant had failed to preserve his challenge to the validity of his guilty plea (*id.* at 413). As an alternative holding, the Court rejected defendant's claim on the merits (*id.*). The Court determined that, "[w]hile the duty to advise a defendant of the possibility of deportation before accepting a plea of guilty is imposed on the trial courts by statute (CPL 220.50 [7]), the court's 'failure to do so does not affect the voluntariness of a guilty plea' " (*id.* at 413-414, quoting *Ford*, 86 NY2d at 404 n). The Court further held that "the duties of a trial court upon accepting a guilty plea are not expanded by *Padilla v Kentucky* (559 US 356 [2010]), which deals exclusively with the duty of defense counsel to advise a defendant of the consequences of pleading guilty when it is clear that deportation is mandated" (*id.* at 414). Finally, in the Court's estimation, the trial court's warning about immigration matters "sufficed to apprise defendant that the consequences of his guilty plea extended to his immigration status" (*id.*). A Judge of this Court granted defendant leave to appeal (19 NY3d 972 [2012]),

and we now conditionally modify the Appellate Division's decision and remit the matter to Supreme Court to afford defendant the opportunity to move to vacate his plea.

*People v Thomas*

On February 15, 1992, defendant Thomas, a legal permanent resident of the United States originally from Jamaica, was arrested for selling cocaine to two individuals. He was later charged in a superior court information with two counts of criminal sale of a controlled substance in the third degree (*see* Penal Law § 220.39 [1]).

On February 20, 1992, defendant appeared with counsel in Supreme Court, waived indictment and pleaded guilty to one count of attempted criminal sale of a controlled substance in the third degree. In exchange for defendant's plea, the court promised to sentence him to 30 days in jail plus five years of probation. However, the court conditioned defendant's receipt of that sentence upon his return to court for sentencing, abstinence from committing further crimes and cooperation with the Department of Probation. At the plea proceeding, the court asked defendant whether he was a citizen of the United States. Defendant answered that he was not a United States citizen and was from Jamaica.

While defendant was at liberty pending sentencing, he failed to show up for a scheduled court appearance, and the court issued a bench warrant for his arrest. On April 28, 1992, defendant's attorney appeared in court and gave the trial judge a copy of defendant's death certificate, which indicated that defendant had committed suicide. The court vacated the bench warrant as abated by death.

About 16 years later, on February 28, 2008, defendant arrived at JFK International Airport and, using an alias, asked customs officials for admission to the United States as a returning lawful permanent resident. A few days later, the United States Department of Homeland Security ran defendant's fingerprints and discovered his true identity. The Department of Homeland Security notified the People of defendant's return to the country, and the People then informed the court of this turn of events. The court restored the case to its calendar and issued a bench warrant for defendant's arrest.

Two days after the issuance of a public notice of the murder of the lawyer who had represented defendant at the time of his plea, defendant moved to withdraw his guilty plea with the as-

sistance of a new attorney. Defendant asserted that the court's failure to warn him that he might be deported as a result of his plea rendered his plea involuntary. Defendant also contended that his previous lawyer had been ineffective for failing to provide advice on the immigration consequences of his plea. In support of the motion, defense counsel submitted an affirmation stating that defendant's previous attorney had not advised defendant at all concerning the possibility of deportation. By contrast, defendant himself averred that his attorney had specifically promised him he would not be subject to deportation if he pleaded guilty.

The trial court denied defendant's plea withdrawal motion. The court found that defendant's allegations regarding his attorney's advice were contradictory and incredible, and that defendant generally lacked credibility because he had absconded and faked his own death. Thus, the court opined, defendant had not credibly established that his attorney's advice had been deficient at the time of his plea or that he had been prejudiced by his attorney's allegedly poor performance. Citing *Ford*, the court concluded that defendant was not entitled to withdraw his plea based on the court's or counsel's failure to apprise him of potential deportation. The court then sentenced defendant to an indeterminate prison term of from 2 to 6 years.

Defendant appealed, renewing his complaints about counsel's advice and the voluntariness of his guilty plea. While defendant's appeal was pending, the Department of Homeland Security charged him with being subject to removal from the United States based on his conviction in this case. Upon learning of defendant's appeal, the federal agency amended the charges to seek defendant's removal based on his failure to disclose his conviction when he applied for an immigrant visa. Defendant was paroled to ICE custody, and an immigration judge later ordered his removal from the country.

Thereafter, the Appellate Division affirmed defendant's conviction (89 AD3d 964, 964-965 [2d Dept 2011]). The Court concluded that defendant's ineffective assistance claim was unpreserved and premised on incredible allegations regarding matters outside the record (*see id.* at 964-965). Finding *Ford* to be controlling, the Court also held that defendant was not entitled to withdraw his guilty plea due to the trial court's failure to mention potential deportation at the plea proceeding (*see* 89 AD3d at 965). A Judge of this Court granted defendant leave to appeal (19 NY3d 1002 [2012]), and we now affirm.

## II

### A

Each defendant maintains that his guilty plea must be vacated because the trial court did not inform him that his plea would subject him to deportation, thereby failing to provide constitutionally mandated notice of a critically important consequence of the plea. However, before we may reach defendants' claims, we must determine whether those claims have been preserved as a matter of law for our review (*see* NY Const art VI, § 3 [a]; CPL 470.05 [2]; *People v Hawkins*, 11 NY3d 484, 491-492 [2008]).

Generally, in order to preserve a claim that a guilty plea is invalid, a defendant must move to withdraw the plea on the same grounds subsequently alleged on appeal or else file a motion to vacate the judgment of conviction pursuant to CPL 440.10 (*see* CPL 220.60 [3]; 440.10; *People v Clarke*, 93 NY2d 904, 906 [1999]; *People v Toxey*, 86 NY2d 725, 726 [1995]; *People v Lopez*, 71 NY2d 662, 665 [1988]). Under certain circumstances, this preservation requirement extends to challenges to the voluntariness of a guilty plea (*see People v Murray*, 15 NY3d 725, 726 [2010]; *Toxey*, 86 NY2d at 726).

However, under *People v Lopez*, where a deficiency in the plea allocution is so clear from the record that the court's attention should have been instantly drawn to the problem, the defendant does not have to preserve a claim that the plea was involuntary because "the salutary purpose of the preservation rule is arguably not jeopardized" (71 NY2d at 665-666). And, in *People v Louree* (8 NY3d 541 [2007]) we concluded that a defendant need not move to withdraw a guilty plea in order to obtain appellate review of a claim that the trial court's failure to inform the defendant of the postrelease supervision component of the defendant's sentence rendered the plea involuntary (*see id.* at 545-547). We carved out that exception to the preservation doctrine because of the "actual or practical unavailability of either a motion to withdraw the plea" or a "motion to vacate the judgment of conviction," reasoning that "a defendant can hardly be expected to move to withdraw his plea on a ground of which he has no knowledge" (*id.* at 546). Taken together, *Lopez* and *Louree* establish that where a defendant has no practical ability to object to an error in a plea allocution which is clear from the face of the record, preservation is not required. At the same time, there are significant constraints on this exception to the

preservation doctrine. Recognizing as much, in *People v Murray*, we held that the defendant had to preserve his claim that the trial court's imposition of a nonconforming term of postrelease supervision rendered his guilty plea involuntary because the court had mentioned the nonconforming postrelease supervision term at sentencing, thereby providing the defendant with an opportunity to challenge the voluntariness of his plea (*see Murray*, 15 NY3d at 726-727).

Here, in *Diaz*, the trial court never alerted defendant that he could be deported as a result of his guilty plea. In fact, the court provided defendant with inaccurate advice, as the court implied that defendant's plea would entail adverse immigration consequences only for someone who was in the country illegally or had existing immigration issues—circumstances which did not apply to defendant. Since defendant did not know about the possibility of deportation during the plea and sentencing proceedings, he had no opportunity to withdraw his plea based on the court's failure to apprise him of potential deportation. Thus, defendant's claim falls within *Lopez*'s and *Louree*'s narrow exception to the preservation doctrine.

By contrast, in *Peque*, because defendant knew of his potential deportation, and thus had the ability to tell the court, if he chose, that he would not have pleaded guilty if he had known about deportation, he was required to preserve his claim regarding the involuntariness of his plea.[3] At sentencing, defendant plainly knew that he might be deported as a result of his guilty plea, and he even implored the court "to have mercy and allow [him] to be deported to [his] country within five years." Given his awareness of the deportation issue at that point, defendant could have sought to withdraw his plea on that ground. The salutary purpose of the preservation doctrine, including the development of a full record and the efficient resolution of claims at the earliest opportunity, is served by requiring preservation in his case. In light of defendant's failure to raise the deportation issue below or move to withdraw his plea, we cannot entertain his newly minted challenge to its validity.

In *Thomas*, defendant fully preserved his claim that the trial court should have informed him that he could be deported as a

---

3. In their respective opinions, the Chief Judge and Judge Rivera disagree with the Court's conclusion that defendant Peque had to preserve his claim and failed to do so, and therefore they do not join in this section of our opinion with respect to Peque (*see* Lippman, Ch. J., dissenting op at 216; *see also* op of Rivera, J., at 218-219 n).

result of his guilty plea, and therefore defendant's challenge to his plea is properly before us.

## B

The State and Federal Constitutions guarantee that the State shall not deprive any person of his or her liberty without due process of law (*see* US Const 14th Amend; NY Const, art I, § 6). To ensure that a criminal defendant receives due process before pleading guilty and surrendering his or her most fundamental liberties to the State, a trial court bears the responsibility to confirm that the defendant's plea is knowing, intelligent and voluntary (*see United States v Ruiz*, 536 US 622, 629 [2002]; *Boykin v Alabama*, 395 US 238, 243-244 [1969]; *Louree*, 8 NY3d at 544-545; *Ford*, 86 NY2d at 402-403). In particular, it "must be clear that 'the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant' " (*Ford*, 86 NY2d at 403, quoting *North Carolina v Alford*, 400 US 25, 31 [1970]; *see People v Gravino*, 14 NY3d 546, 553 [2010]). To that end, while the court need not inform the defendant of every possible repercussion of a guilty plea prior to its entry (*see Ruiz*, 536 US at 629-630; *Gravino*, 14 NY3d at 553), the court must advise the defendant of the direct consequences of the plea (*see People v Catu*, 4 NY3d 242, 244 [2005]; *Ford*, 86 NY2d at 403; *see also Brady v United States*, 397 US 742, 755 [1970]). On the other hand, the court generally has no obligation to apprise the defendant of the collateral consequences of the plea (*see Gravino*, 14 NY3d at 553; *Ford*, 86 NY2d at 403).

A direct consequence of a guilty plea is one "which has a definite, immediate and largely automatic effect on [the] defendant's punishment" (*Ford*, 86 NY2d at 403; *see People v Monk*, 21 NY3d 27, 32 [2013]; *see also United States v Youngs*, 687 F3d 56, 60 [2d Cir 2012]; *United States v Delgado-Ramos*, 635 F3d 1237, 1239-1240 [9th Cir 2011]), whereas a collateral consequence is one "peculiar to the individual's personal circumstances and one not within the control of the court system" (*Ford*, 86 NY2d at 403; *see People v Belliard*, 20 NY3d 381, 385 [2013]). Examples of direct consequences include the forfeiture of trial rights (*see Boykin*, 395 US at 243-244), the imposition of a mandatory term of imprisonment that results from an unconditional guilty plea (*see id.* at 244 n 7; *Jamison v Klem*, 544 F3d 266, 277 [3d Cir 2008]; *People v Harnett*, 16 NY3d 200, 205 [2011]), and the imposition of mandatory postrelease

supervision (*see Catu*, 4 NY3d at 244-245). By contrast, "[i]llustrations of collateral consequences are loss of the right to vote or travel abroad, loss of civil service employment, loss of a driver's license, loss of the right to possess firearms[,] . . . an undesirable discharge from the Armed Services" (*Ford*, 86 NY2d at 403 [citations omitted]), the imposition of a prison term upon revocation of postrelease supervision (*see Monk*, 21 NY3d at 33), sex offender registration under the Sex Offender Registration Act (SORA) (*see Gravino*, 14 NY3d at 559), and civil confinement under the Sex Offender Management and Treatment Act (SOMTA) (*see Harnett*, 16 NY3d at 206).

Furthermore, in *Ford*, this Court held that "[d]eportation is a collateral consequence of conviction because it is a result peculiar to the individual's personal circumstances and one not within the control of the court system" (*Ford*, 86 NY2d at 403). Likewise, certain federal circuit courts have held that a court need not advise a pleading defendant of the possibility of deportation because deportation is a collateral consequence of a guilty plea (*see e.g. Delgado-Ramos*, 635 F3d at 1241; *Santos-Sanchez v United States*, 548 F3d 327, 336-337 [5th Cir 2008]; *El-Nobani v United States*, 287 F3d 417, 421 [6th Cir 2002]; *United States v Gonzalez*, 202 F3d 20, 27 [1st Cir 2000]). Additionally, shortly before this Court's decision in *Ford* and after the defendant's guilty plea in that case, the Legislature passed CPL 220.50 (7). That statute requires a court to inform a noncitizen defendant that a guilty plea may subject the defendant to deportation, but it also states that "[t]he failure to advise the defendant pursuant to this subdivision shall not be deemed to affect the voluntariness of a plea of guilty or the validity of a conviction" (*id.*).

Here, defendants' convictions upon their guilty pleas rendered them subject to deportation, and in each case, the trial court did not alert the defendant to that circumstance. Defendants claim that recent changes in federal immigration law have transformed deportation into a direct consequence of a noncitizen defendant's guilty plea, and that therefore the courts' failure here to mention the possibility of deportation rendered their pleas involuntary. Defendants thus urge us to overrule so much of *Ford* as holds otherwise. In opposition, the People maintain that, because federal authorities retain a significant degree of discretion in determining whether to deport a convicted felon, deportation remains a strictly collateral consequence of a guilty

plea which does not have to be set forth during the plea allocution. The parties' arguments necessitate an examination of the evolving relationship between the immigration system and a New York criminal conviction before and after *Ford.*

## C

As early as the mid-seventeenth century, the Dutch colony that would become New York experienced widespread immigration. By the late 1650s, non-Dutch European immigrants comprised about half the colony's population, and it appears that there were few, if any, legal restrictions on immigration at that time (*see* Milton M. Klein et al., The Empire State: A History of New York 45, 49-51 [2001] [hereinafter "Klein"]). This situation essentially continued through British rule of the colony and New York's early days as a state in post-revolutionary America (*see* Klein 153-154, 157-159, 308-311). During that span of history, immigrants contributed significantly to the constitutional tradition underlying today's decision. In the seventeenth century, the original foreign-born colonists brought with them the common-law tradition of individual rights, and in 1821, naturalized immigrants in certain progressive counties of the State provided the population, clout and votes needed to call for a constitutional convention, resulting in New York's becoming the first state to add a due process clause to its constitution (*see* J. Hampden Dougherty, Constitutional History of the State of New York 29, 42-43, 97-99 [1915]; Peter J. Galie & Christopher Bopst, The New York State Constitution 68-69 [2d ed 2012]).

Immigration laws began to change in the mid-nineteenth century. Prior to that time, New York City modestly regulated immigration, imposing various capitations on merchant shipmasters who transported impoverished immigrants to this country by sea and requiring those shipmasters to report certain identification information about their immigrant passengers to the Mayor (*see* Hidetaka Hirota, *The Moment of Transition: State Officials, the Federal Government, and the Formation of American Immigration Policy*, 99 J Am Hist 1092, 1095 [2013] [hereinafter "Hirota"]; *see also Henderson v Mayor of New York*, 92 US 259, 265-275 [1875] [describing New York City's immigration laws and striking down some of them as violative of the federal government's exclusive power to regulate commerce with foreign nations under the Federal Constitution]). In 1847, however, New York State passed laws which excluded from entry to the State any foreigner "likely to become

permanently a public charge" as a penalty for a shipmaster's nonpayment of a bond for such a person (Hirota, 99 J Am Hist at 1095). Furthermore, in 1882, the State successfully lobbied Congress to pass the Immigration Act, which prohibited entry into the United States of "convict[s]" (22 US Stat 214 [1882]; *see* Hirota, 99 J Am Hist at 1097-1098).

Even after the onset of federal regulation of immigration, removal from the country was largely discretionary and relatively uncommon. When Congress passed the Immigration Act of 1917, it authorized for the first time the deportation of noncitizens who had been convicted of crimes of "moral turpitude" and had served a sentence of a year or more in prison (39 US Stat 874, 889-890 [1917]). Under the 1917 Act, a state sentencing court had discretion to grant a noncitizen defendant a judicial recommendation against deportation, or JRAD, which prevented the federal government from deporting the defendant (*see* 39 US Stat at 889-890). New York officials also saw fit to extend discretionary relief to alien convicts to prevent their deportation. As noted in the Poletti Committee's report in preparation for the State's constitutional convention of 1938, the Governor would sometimes, where the facts warranted it, pardon a prisoner to "restore citizenship . . . or to prevent deportation or to permit naturalization" (*Problems Relating to Executive Administration and Powers*, 1938 Rep of NY Constitutional Convention Comm, vol 8 at 66 [1938]).

Executive discretion in the immigration field, however, did not remain untrammeled for long. By successive revisions to the Immigration and Nationality Act (INA) in 1952 and 1990, Congress first curtailed and then eliminated the availability of JRADs, while preserving the United States Attorney General's discretion to grant relief from deportation (*see* 66 US Stat 163, 201-208 [1952]; 104 US Stat 4978, 5050-5052 [1990]). In 1996, Congress finally stripped the Attorney General of his discretion to prevent a noncitizen defendant's deportation (*see* 110 US Stat 3009-546, 3009-567, 3009-594, 3009-596, 3009-597 [1996]). And, under the current version of the INA, an alien may be deported for a wide array of crimes, including most drug offenses, "aggravated felonies," domestic violence crimes, and any crime for which a sentence of more than a year is authorized (*see* 8 USC §§ 1101 [a] [43]; 1227 [a] [2]). Therefore,

> "[u]nder contemporary law, if a noncitizen has committed a removable offense after the 1996 effective

date of these amendments, his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses" (*Padilla*, 559 US at 363-364; *see generally* 8 USC § 1227; 110 US Stat 1214 [1996]).

Changes in immigration enforcement have also increased the likelihood that a noncitizen defendant will be deported after a guilty plea. For example, at the time of the passage of the 1996 amendments to the INA, the number of annual deportations resulting from criminal convictions stood at 36,909 (*see* Department of Homeland Security, 1996 Yearbook of Immigration Statistics, Annual Report on Immigration Enforcement Actions at 171 [1997], available at http://www.dhs.gov/archives [accessed Sept. 18, 2013]). Thereafter, the federal government deported an ever-growing number of individuals each year, and in 2011, the United States removed 188,382 noncitizens based on their criminal convictions (*see* Department of Homeland Security, 2011 Yearbook of Immigration Statistics, Annual Report on Immigration Enforcement Actions at 5-6 [2012], available at http://www.dhs.gov/sites/default/files/publications/immigration-statistics/enforcement_ar_2011.pdf [accessed Sept. 18, 2013]; *see also* Douglas S. Massey & Karen A. Pren, *Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America*, 38 Population & Dev Rev [Issue 1] 1, 15-16 [2012]). And, since 1995, the Institutional Removal Program, a joint initiative of New York and federal authorities, has enabled New York to transfer thousands of convicted foreign-born criminals from state custody to ICE custody prior to the expiration of their prison terms (*see* Correction Law § 5 [4]; Executive Law § 259-i [2] [d] [i]; New York State Department of Corrections and Community Supervision, Research Report: The Foreign-Born under Custody Population and the IRP at 1, 9-11 [2012], available at http://www.doccs.ny.gov/Research/Reports/2013/ForeignBorn_IRP_Report_2012.pdf [accessed Sept. 18, 2013]; *see also* brief of Immigrant Defense Project, as amicus curiae, at 15-20).

Present-day immigration law and enforcement practice impose what can only be described as an enormous penalty upon noncitizen convicts. Once state and federal authorities identify a defendant as a potentially removable alien, ICE may detain the defendant until administrative or judicial review

causes him to be released or adjudged deportable, and that detention will last at least several days and, in some cases, for months or years before the defendant's removal status is finally settled (*see* 8 USC § 1226 [c] [1]; *Demore v Kim*, 538 US 510, 529 [2003] [noting average detention period of 47 days]; *see also* Amnesty International, *Jailed without Justice: Immigration Detention in the USA* at 1, 22 [2009] [describing an alien convict's four-year detention during removal proceedings], available at http://www.amnestyusa.org/pdfs/JailedWithoutJustice .pdf [accessed Sept. 21, 2013]; Joren Lyons, *Recent Development: Mandatory Detention During Removal Proceedings: Challenging the Applicability of Demore v Kim to Vietnamese and Laotian Detainees*, 12 Asian LJ 231, 231-232 [2005] [recounting an immigrant convict's 16-month detention]). If an immigration judge orders the defendant's deportation, ICE can automatically hold the defendant in custody for another 90 days and may continue to confine the defendant beyond that period subject to a judicial determination that further detention is reasonably necessary to secure the defendant's removal (*see Zadvydas v Davis*, 533 US 678, 682-684, 699-701 [2001]). Additionally, immigrant detention resembles criminal incarceration, and the conditions of that detention are such that "in general, criminal inmates fare better than do civil detainees" (Dora Schriro, *Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees*, 47 Am Crim L Rev 1441, 1445 [2010]).[4]

Of course, a convicted noncitizen defendant's actual removal from the country exacts the greatest toll on the defendant and his or her family. Once the federal government forces the defendant beyond our borders, the defendant loses the precious rights and opportunities available to all residents of the United States. After being removed from the country, the defendant rarely, if ever, has further in-person contact with any family members remaining in America. Additionally, deportation effectively strips the defendant of any employment he or she had in this country, thus depriving the defendant and his or her family of critical financial support. And, the defendant must begin life anew in a country that, in some cases, is more foreign to the defendant than the United States.

---

4. We commend the defendants' attorneys, the prosecutors and counsel for amicus for their excellent work in bringing a wealth of authorities, research, data and scholarly articles to our attention to assist us in our resolution of these appeals.

Despite those severe qualities, deportation is not technically a criminal punishment for past behavior, but rather a civil penalty imposed upon noncitizens whose continuing presence in the country is deemed undesirable by the federal government based on their misconduct or other aggravating circumstances (*see Padilla*, 559 US at 365; *INS v St. Cyr*, 533 US 289, 324 [2001]; *INS v Lopez-Mendoza*, 468 US 1032, 1038 [1984]; *Morris v Holder*, 676 F3d 309, 317 [2d Cir 2012]). However, in *Padilla v Kentucky*, the United States Supreme Court recognized that deportation could not be neatly confined to the realm of civil matters unrelated to a defendant's conviction.

Specifically, the Court held that, because deportation is so closely related to the criminal process and carries such high stakes for noncitizen defendants, a defense attorney deprives a noncitizen defendant of his or her Sixth Amendment right to the effective assistance of counsel by failing to advise, or by misadvising, the defendant about the immigration consequences of a guilty plea (*see* 559 US at 366-374). In discussing the significance of the possibility of deportation and the need for competent advice from counsel on the subject, the Court observed, "Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century . . . [a]nd, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders" (*id.* at 365-366). The Court continued, "Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence" of a guilty plea for Sixth Amendment purposes (*id.* at 366).

In determining whether the Supreme Court's discussion of the character of deportation holds true for due process purposes, it is necessary to account for the distinct nature of the right to due process and the right to the effective assistance of counsel at issue in *Padilla*. Although both of those rights exist to preserve the defendant's entitlement to a fair trial or plea proceeding, they operate in discrete ways in the plea context. The right to effective counsel guarantees the defendant a zealous advocate to safeguard the defendant's interests, gives the defendant essential advice specific to his or her personal circumstances and enables the defendant to make an intelligent choice between a plea and trial, whereas due process places an independent responsibility on the court to prevent the State from accepting a guilty plea without record assurance that the

defendant understands the most fundamental and direct conse-quences of the plea (*see Alford*, 400 US at 31; *Strickland v Washington*, 466 US 668, 684-687 [1984]; *Hill v Lockhart*, 474 US 52, 56-58 [1985]; *People v Angelakos*, 70 NY2d 670, 672-674 [1987]; *People v Harris*, 61 NY2d 9, 18-19 [1983]). Given the distinct duties of counsel and the court under these two constitutional doctrines, *Padilla*'s legal classification of deporta-tion as a plea consequence necessitating counsel's advice under the Sixth Amendment does not inexorably compel the conclu-sion that deportation implicates the court's responsibility to ensure the voluntariness of a guilty plea.

Nonetheless, the *Padilla* Court's factual observation about the nature of deportation rings true in both the due process and effective assistance contexts; it is difficult to classify deportation as either a direct or collateral consequence of a noncitizen de-fendant's guilty plea.[5] On the one hand, deportation is not always an immediate consequence of an alien defendant's guilty plea because the federal government must await the defend-ant's release from state custody and the outcome of a removal hearing before deporting the defendant. And, immigration authorities may not even initiate that process, much less complete it, until many years after the defendant's criminal conviction. Furthermore, deportation is not a part of the de-fendant's criminal punishment and sentence, making it distinct from other direct consequences of a guilty plea such as the imposition of postrelease supervision. So, too, deportation, like most collateral consequences, remains a matter "not within the control of the court system" (*Ford*, 86 NY2d at 403).

However, under current federal law, deportation is a virtually automatic result of a New York felony conviction for nearly every noncitizen defendant (*see Padilla*, 559 US at 363-366), and New York defendants are often released to ICE custody even before they finish serving their prison sentences. Signifi-cantly, deportation has punitive qualities not entirely unlike the core components of a criminal sentence. Judges Graffeo, Read and I conclude that those circumstances cause deportation to

---

5. Chief Judge Lippman and Judge Rivera conclude that the direct/collateral framework does not apply to deportation, and that regardless of deportation's particular classification as a plea consequence, it is sufficiently important to warrant the court's advisement on the matter (*see* Lippman, Ch. J., dissenting op at 207, 208-209; *see also* op of Rivera, J., at 219). Accord-ingly, they do not agree with us that deportation is a technically collateral con-sequence of a guilty plea, and they do not join this opinion to the extent it contradicts the views expressed in their respective opinions.

resemble in many respects a direct consequence of a guilty plea, even though we concur with Judges Pigott and Smith that it is technically on the collateral side of the direct/collateral divide.[6]

We have previously contemplated the existence of such a peculiar consequence of a guilty plea, though we had not actually encountered one until now. And, in prior decisions, we discussed how a trial court must address these most uncommon consequences at a plea proceeding. Particularly, we stated that there may be a "rare" case where a court must inform the defendant of "a consequence that, although collateral for purposes of due process, was of such great importance to him that he would have made a different decision had that consequence been disclosed" (*Gravino*, 14 NY3d at 559; *see Harnett*, 16 NY3d at 207). This is that rare case.

As discussed, deportation is an automatic consequence of a guilty plea for most noncitizen defendants; absent some oversight by federal authorities, a defendant duly convicted of almost any felony will inevitably be removed from the United States. Unlike SORA registration, SOMTA confinement or other collateral consequences, the deportation process deprives the defendant of an exceptional degree of physical liberty by first detaining and then forcibly removing the defendant from the country. Consequently, the defendant may not only lose the blessings of liberty associated with residence in the United States, but may also suffer the emotional and financial hardships of separation from work, home and family. Given the severity and inevitability of deportation for many noncitizen defendants, "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes" (*Padilla*, 559 US at 364). Thus, a noncitizen defendant convicted of a removable crime can hardly make "a voluntary and intelligent choice among the alternative courses of action open to the defendant" (*Ford*, 86 NY2d at 403) unless the court informs

---

**6.** Judges Pigott and Smith agree that deportation is not a direct consequence of a guilty plea, but they would go further and hold that deportation is a strictly collateral consequence of a guilty plea, such that a trial court's failure to mention deportation can never invalidate a guilty plea (*see* Pigott, J., dissenting in part op at 204-205). As already noted, Chief Judge Lippman and Judge Rivera find the distinction between direct and collateral consequences to be inapplicable to this case. Accordingly, with the exception of the Chief Judge's and Judge Rivera's concurrence in the last paragraph of this section of this opinion regarding the necessity of a trial court's advisement about deportation, those four Judges do not join the remainder of this section.

the defendant that the defendant may be deported if he or she pleads guilty.

But, the People protest, that is not the case. In their view, deportation remains a strictly collateral consequence of a guilty plea, about which a trial court has no duty to inform a defendant. They observe that ICE retains considerable discretion to decline to enforce federal immigration laws against any particular defendant, making deportation such an uncertain outcome that the court should never be compelled to notify a defendant of the possibility of it. However, the roughly 188,000 noncitizen convicts who are deported each year would probably beg to differ on this point, and rightly so. After all, although New York courts have no role in ICE's enforcement decisions, they do render judgments of conviction which routinely ensure the defendants' eventual transfer, by way of state correctional authorities, into federal custody, where they will almost certainly be deported. At bottom, the factors cited by the People merely show that deportation does not fit squarely within the direct consequences mold. Although that is true, fundamental fairness still requires a trial court to make a noncitizen defendant aware of the risk of deportation because deportation frequently results from a noncitizen's guilty plea and constitutes a uniquely devastating deprivation of liberty.

The People assure us there is no need for the trial court to tell a noncitizen defendant about the possibility of deportation because *Padilla* now requires defense counsel to provide a noncitizen defendant with specific and detailed advice about a guilty plea's impact on his or her immigration status. However, "assuming defense counsel 'will' do something simply because it is required of effective counsel" is "an assumption experience does not always bear out" (*Moncrieffe v Holder*, 569 US —, —, 133 S Ct 1678, 1692 [2013]). More to the point, while counsel's participation in the relevant proceedings may tend to support the validity of the plea (*see People v Harris*, 61 NY2d 9, 16 [1983]; *People v Nixon*, 21 NY2d 338, 353 [1967]), the court has an independent obligation to ascertain whether the defendant is pleading guilty voluntarily (*see People v Francis*, 38 NY2d 150, 153-154 [1975]), which the court must fulfill by alerting the defendant that he or she may be deported.

■ In short, Chief Judge Lippman, Judges Graffeo, Read, Rivera and I conclude that deportation constitutes such a substantial and unique consequence of a plea that it must be mentioned by the trial court to a defendant as a matter of fundamental fairness.

## D

Because the Court's conclusion regarding a trial court's duty is at odds with *Ford*'s pronouncement that a court's failure to warn a defendant about potential deportation never impacts the validity of the defendant's guilty plea, that aspect of *Ford* must be reexamined in light of the doctrine of stare decisis.

"Stare decisis is the doctrine which holds that common-law decisions should stand as precedents for guidance in cases arising in the future" and that a rule of law "once decided by a court, will generally be followed in subsequent cases presenting the same legal problem" (*People v Damiano*, 87 NY2d 477, 488 [1996, Simons, J., concurring]). Stare decisis promotes predictability in the law, engenders reliance on our decisions, encourages judicial restraint and reassures the public that our decisions arise from a continuum of legal principle rather than the personal caprice of the members of this Court (*see People v Taylor*, 9 NY3d 129, 148 [2007]).

Under stare decisis principles, a case "may be overruled only when there is a compelling justification for doing so" (*People v Lopez*, 16 NY3d 375, 384 n 5 [2011]; *see Taylor*, 9 NY3d at 148-149; *Eastern Consol. Props. v Adelaide Realty Corp.*, 95 NY2d 785, 787 [2000]). Such a compelling justification may arise when the Court's prior holding "leads to an unworkable rule, or . . . creates more questions than it resolves" (*Taylor*, 9 NY3d at 149); adherence to a recent precedent "involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience" (*People v Hobson*, 39 NY2d 479, 487 [1976], quoting *Helvering v Hallock*, 309 US 106, 119 [1940]); or "a preexisting rule, once thought defensible, no longer serves the ends of justice or withstands the cold light of logic and experience" (*Policano v Herbert*, 7 NY3d 588, 604 [2006] [internal quotation marks and citation omitted]). In determining the precedential effect to be given to a prior decision, this Court must consider "the exercise of restraint in overturning established well-developed doctrine and, on the other hand, the justifiable rejection of archaic and obsolete doctrine which has lost its touch with reality" (*Hobson*, 39 NY2d at 487).

As noted above, in *Ford*, we concluded that, because deportation was a collateral consequence of a guilty plea, the trial court did not have to advise the defendant of the possibility of deportation during the plea allocution (*see* 86 NY2d at 403-404). Specifically, after setting forth the general factors distinguishing direct

and collateral consequences and providing some illustrative examples, we stated

> "Deportation is a collateral consequence of conviction because it is a result peculiar to the individual's personal circumstances and one not within the control of the court system. Therefore, our Appellate Division and the Federal courts have consistently held that the trial court need not, before accepting a plea of guilty, advise a defendant of the possibility of deportation. We adopt that rule and conclude that in this case the court properly allocuted defendant before taking his plea of guilty to manslaughter in the second degree." (*Id.* [citations omitted].)

Thus, we determined, "The [plea] court was under no obligation to inform the defendant of any possible collateral consequences of his plea, including the possibility of deportation, nor was defendant denied effective assistance of counsel" due to counsel's lack of advice on the subject (*id.* at 405). Accordingly, *Ford* rested largely on the weight of authority at the time, i.e., prior to the 1996 amendments to the INA, which held deportation to be a collateral consequence of a guilty plea (*see e.g. United States v Parrino*, 212 F2d 919, 921-922 [2d Cir 1954]).

However, the weight of authority and the will of Congress have shifted since our decision in *Ford*. To the extent *Ford* stands for the proposition that the court's complete omission of any discussion of deportation at the plea proceeding can never render a defendant's plea involuntary, that discrete portion of our opinion in *Ford* "no longer serves the ends of justice or withstands the cold light of logic and experience" (*Policano*, 7 NY3d at 604). *Ford*'s discussion of deportation was rooted in a legal and practical landscape that no longer exists, and the realities of the present-day immigration system have robbed it of much of its logical and experiential foundation. Given the nearly inevitable consequence of deportation, it no longer serves the ends of justice to perpetually uphold, without regard to the significance of deportation to the individual's decision to plead guilty, every guilty plea of a noncitizen defendant entered in ignorance of the likelihood of removal from this country. We therefore overrule only so much of *Ford* as suggests that a trial

court's failure to tell a defendant about potential deportation is irrelevant to the validity of the defendant's guilty plea.[7]

In taking this extraordinary step, Judges Graffeo, Read and I do not treat as inconsequential the considerable reliance which *Ford*'s assessment of deportation has engendered among prosecutors and trial courts throughout the State. Certainly, our repeated approving citations of *Ford* provided no reason to doubt the continued vitality of its pronouncement with respect to the immigration consequences of a guilty plea. So, too, we are mindful that *Ford*'s discussion of deportation reinforced the repose afforded to the People by a noncitizen defendant's guilty plea. And, for nearly two decades, trial courts have relied on *Ford*'s characterization of deportation as a collateral consequence of a plea to avoid potentially time-consuming litigation regarding the possibility of deportation. However, those significant reliance interests cannot overcome the fundamental injustice that would result from completely barring a noncitizen defendant from challenging his or her guilty plea based on the court's failure to advise the defendant that he or she might be deported as a result of the plea.

To avoid any confusion about the scope of our decision, we emphasize that it is quite narrow. Nothing in this opinion should be construed as casting doubt on the long-standing rule that, almost invariably, a defendant need be informed of only the direct consequences of a guilty plea and not the collateral consequences. We continue to adhere to the direct/collateral framework, and we do not retreat from our numerous prior decisions holding a variety of burdensome consequences of a guilty plea to be strictly collateral and irrelevant to the voluntariness of a plea (*see Monk*, 21 NY3d at 32; *Belliard*, 20 NY3d at 385; *Harnett*, 16 NY3d at 205-206; *Gravino*, 14 NY3d at 553-554). Indeed, the Court's decision in the instant appeals arises from the truly unique nature of deportation as a consequence of a guilty plea; there is nothing else quite like it.

---

**7.** Chief Judge Lippman and Judge Rivera concur in the Court's decision to overrule this specific portion of *Ford*'s holding, but unlike a majority of this Court, comprised of Judges Graffeo, Read, Smith, Pigott and me, they doubt the validity of our precedents following *Ford* (*compare* Lippman, Ch. J., dissenting op at 211 [stating that *Ford* "is in its two principal holdings, if not in its ratio decidendi, no longer viable"], *with* Pigott, J., dissenting in part op at 205 ["creat(ing) no new law"]). Therefore, the Chief Judge and Judge Rivera do not join the remainder of this section of this opinion.

## E

■ As the Court[8] recognizes today, to protect the rights of the large number of noncitizen defendants pleading guilty to felonies in New York, trial courts must now make all defendants aware that, if they are not United States citizens, their felony guilty pleas may expose them to deportation.[9] Mindful of the burden this rule imposes on busy and calendar-conscious trial courts, they are to be afforded considerable latitude in stating the requisite advice. As this Court has repeatedly held, "trial courts are not required to engage in any particular litany during an allocution in order to obtain a valid guilty plea" (*People v Moissett*, 76 NY2d 909, 910 [1990]). As long as the court assures itself that the defendant knows of the possibility of deportation prior to entering a guilty plea, the plea will be deemed knowing, intelligent and voluntary.

The trial court must provide a short, straightforward statement on the record notifying the defendant that, in sum and substance, if the defendant is not a United States citizen, he or she may be deported upon a guilty plea. The court may also wish to encourage the defendant to consult defense counsel about the possibility of deportation. In the alternative, the court may recite the admonition contained in CPL 220.50 (7) that "if the defendant is not a citizen of the United States, the defendant's plea of guilty and the court's acceptance thereof may result in the defendant's deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States." Again, these examples are illustrative, not exhaustive, of potentially acceptable advisements regarding deportation.

## F

As explained above, a majority of the Court, including Chief Judge Lippman, Judges Graffeo, Read, Rivera and me, concludes that due process requires a trial court to warn a defendant that, if the defendant is not a citizen of this country, the defendant may be deported as a result of a guilty plea to a felony. A separate majority of the Court, comprised of Judges Graffeo, Read,

---

8. The Court here refers to Chief Judge Lippman, Judges Graffeo, Read, Rivera and me.

9. Given that defendants were convicted of felonies here, we have no occasion to consider whether our holding should apply to misdemeanor pleas.

Smith and me, now turns to the question of the proper remedy.[10] In this section of the opinion, this remedial majority describes the general parameters of the proper remedy of the relevant due process violation, and in section G, infra, we apply that remedy to defendants in these cases.

■ The failure to apprise a defendant of deportation as a consequence of a guilty plea only affects the voluntariness of the plea where that consequence "was of such great importance to him that he would have made a different decision had that consequence been disclosed" (*Gravino*, 14 NY3d at 559). Therefore, in order to withdraw or obtain vacatur of a plea, a defendant must show that there is a reasonable probability that he or she would not have pleaded guilty and would have gone to trial had the trial court informed the defendant of potential deportation.[11]

---

**10.** Again, Judge Smith does not concur in the Court's due process holding, but rather concurs only in the remedy which this opinion specifies in light of that holding.

**11.** Judge Pigott's opinion dissenting in part reaches "a very similar conclusion" to our own and "would create no new law" (Pigott, J., dissenting in part op at 205), but the dissent faults us for, in its view, implicitly "contradict[ing]" our decisions in *Gravino* and *Harnett* (*id.* at 205) and failing to provide noncitizen defendants with any practical benefit beyond that to which they are already entitled under *Padilla* (*id.* at 206). But, as stated at length above, our decision does nothing to disturb *Gravino*, *Harnett* or our settled jurisprudence in this area; as was the case with SORA registration or SOMTA confinement at issue in those decisions, the direct or collateral character of deportation, and the necessity of the trial court's advice with respect to it, depends on its particular qualities.

In addition, our decision here provides noncitizen defendants with a significant practical benefit in addition to *Padilla*'s mandate. After all, a defendant challenging his plea under *Padilla* must possess an adequate record of both counsel's deficient performance and prejudice, and because counsel's advice or omissions with respect to the immigration consequences of a plea are often outside the record on direct appeal, the defendant must usually resort to a postjudgment motion to satisfy the performance prong of *Padilla*, not to mention the prejudice prong. By contrast, the defendant may raise a due process claim on direct appeal based on the court's failure to mention deportation as a consequence of the plea, which will be apparent on the face of the record. Thus, the defendant will be entitled to a remittal to attempt to establish prejudice stemming from the readily apparent error. So, too, in some cases, the record on direct appeal may reveal factors which would have strongly compelled the defendant to reject the plea in an effort to avoid deportation, and thus the defendant could establish prejudice for due process purposes on direct appeal, without remittal, even though he could not show that his attorney was ineffective under *Padilla*. Indeed, there may be a variety of cases involving an ineffective assistance claim under *Padilla* and a due process

In determining whether the defendant has shown such prejudice, the court should consider, among other things, the favorability of the plea, the potential consequences the defendant might face upon a conviction after trial, the strength of the People's case against the defendant, the defendant's ties to the United States and the defendant's receipt of any advice from counsel regarding potential deportation. This assessment should be made in a commonsense manner, with due regard for the significance that potential deportation holds for many noncitizen defendants. To aid in this undertaking, where possible, the defendant should make every effort to develop an adequate record of the circumstances surrounding the plea at sentencing, which will permit the trial court to efficiently determine the plea's validity and enable appellate review of the defendant's claim of prejudice.[12]

Chief Judge Lippman, with whom Judge Rivera joins, maintains that we are unfaithful to our *Catu* line of cases because we do not mandate automatic vacatur of a plea as the result of the court's failure to mention the possibility of deportation at the plea allocution (*see* Lippman, Ch. J., dissenting op at 209-212; *see also* op of Rivera, J., at 218-219). However, we are simply adhering to *Gravino* and *Harnett*, not departing from *Catu*. *Gravino* and *Harnett* make clear that when a uniquely significant plea consequence, while technically collateral, impacts the voluntariness of a defendant's plea, the defendant may receive his plea back only upon a showing of prejudice (*see Harnett*, 16 NY3d at 206-207; *Gravino*, 14 NY3d at 559). By contrast, the defendant is entitled to automatic vacatur of the

---

claim under the instant decision where a showing sufficient to warrant vacatur of the plea under one of those two doctrines will not satisfy the requirements of the other one. Accordingly, while we exercise restraint in balancing defendants' liberty and the State's interests to resolve the instant appeals, our decision is not the empty gesture that Judge Pigott's opinion mistakes it for.

**12.** In light of our conclusion that a trial court's failure to inform a defendant of potential deportation may render his or her guilty plea involuntary under certain circumstances, CPL 220.50 (7) cannot be read to deny vacatur of a plea when due process commands that relief. Rather, the statutory language stating that the court's failure to inform the defendant of potential deportation "shall not be *deemed* to affect the voluntariness of a plea of guilty" (*id.* [emphasis added]) can be plausibly read as an instruction to the court that it may not automatically "deem" the plea to be invalid based on the court's inadequate advice alone but rather must determine whether the defendant has been prejudiced before concluding that the plea was in fact involuntary. Indeed, we adopt this interpretation in large part to avoid constitutional concerns (*see Tauza v Susquehanna Coal Co.*, 220 NY 259, 267 [1917]).

plea only where, as in *Catu*, the court fails to mention a direct consequence of the defendant's plea (*see Catu*, 4 NY3d at 245). Here, as we have explained, deportation is a consequence of the sort described in *Gravino* and *Harnett* rather than a direct consequence, and to obtain vacatur of a plea based on the court's failure to mention deportation at the plea proceeding, a noncitizen defendant must demonstrate that he or she was prejudiced by the court's omission. Thus, our opinion is consistent with *Gravino*, *Harnett* and *Catu*.

In the Chief Judge's view, we are "telescop[ing]" the remedy for a due process violation and the ineffective assistance of counsel (Lippman, Ch. J., dissenting op at 211). But, to the extent our remedial approach to the instant appeals resembles the remedy for an attorney's constitutionally deficient performance, that makes eminent sense because, as we have previously observed, "the issue of whether [a] plea was voluntary," a matter of core concern for due process purposes, "may be closely linked to the question of whether a defendant received the effective assistance of counsel" (*Harnett*, 16 NY3d at 207). Thus, while the remedy for a due process violation as identified by the Court in these appeals is not coextensive with *Padilla*'s remedial rule in the ineffective assistance context, the two doctrines are similar.

## G

As previously noted, defendant Peque did not preserve his claim that his plea was involuntary, and therefore we consider the application of the principles delineated above only in *Diaz* and *Thomas*.

In *Diaz*, the trial court clearly failed to tell defendant that he might be deported if he pleaded guilty. Thus, if defendant has been prejudiced by that error, he is entitled to vacatur of his plea. Given that Supreme Court did not address the deficiency in the plea allocution at all, much less assess prejudice, defendant is entitled to a remittal to that court to allow him to move to vacate his plea and develop a record relevant to the issue of prejudice. Likewise, in future cases of this kind, where the deficiency in the plea allocution appears on the face of the record, the case should be remitted to the trial court to allow the defendant to file a motion to vacate the plea. Upon a facially sufficient plea vacatur motion, the court should hold a hearing to provide the defendant with an opportunity to demonstrate prejudice. In the instant case, if defendant can demonstrate that he

was prejudiced by the defect in the plea allocution upon remittal to Supreme Court, the court must vacate his plea. In the absence of a showing of prejudice, the court should amend the judgment of conviction to reflect its ruling on defendant's plea vacatur motion and otherwise leave the judgment undisturbed.[13]

Unlike defendant Diaz, however, defendant Thomas cannot obtain relief based on the trial court's plea allocution in his case. Specifically, defendant Thomas's challenge to the voluntariness of his plea must be evaluated in light of the practical and legal relationship between a criminal conviction and deportation at the time he pleaded guilty in 1992. As discussed in detail above, at that time, deportation was a far less certain consequence of most defendants' guilty pleas because the federal government deported far fewer convicts and possessed far broader discretion to allow them to remain in the United States. Indeed, in acknowledgment of the federal government's broad discretion and latitude pertaining to deportation of immigrants around the time of defendant's plea, this Court and many federal courts recognized the strictly collateral nature of the immigration consequences of a guilty plea and held that a trial court did not have to advise a noncitizen defendant that his or her plea might subject the defendant to deportation (*see e.g. Ford*, 86 NY2d at 403-405; *United States v Littlejohn*, 224 F3d 960, 965 [9th Cir 2000]; *Gonzalez*, 202 F3d at 27; *United States v United States Currency in the Amount of $228,536.00*, 895 F2d 908, 915 [2d Cir 1990]; *United States v Romero-Vilca*, 850 F2d 177, 179 [3d Cir 1988]; *Fruchtman v Kenton*, 531 F2d 946, 948-949 [9th Cir 1976]). That being so, trial courts then had no general duty to advise noncitizen defendants of the possibility of deportation as a consequence of their guilty pleas. And, here, the court had every reason to believe that defendant could avoid deportation as a result of his plea, notwithstanding that,

---

**13.** As mentioned above, defendant Diaz previously filed a CPL 440.10 motion seeking relief under *Padilla*, and Supreme Court denied the motion because defendant did not establish that he was prejudiced by his attorney's failure to inform him that his guilty plea could lead to his deportation. Notably, though, the Appellate Division denied defendant permission to appeal from the lower court's decision, and therefore we have no occasion to consider the denial of defendant's postjudgment motion in determining whether he should be granted relief on direct appeal. Furthermore, the People do not argue that the court's rejection of defendant's claim under *Padilla* should estop him from seeking to establish that the court's failure to warn him about potential deportation caused him prejudice. Accordingly, on these specific facts, defendant's prior postjudgment motion does not warrant an affirmance of his conviction without a remittal.

unbeknownst to the court, he had not resided in the United States for a sufficient period of time to avail himself of the Attorney General's discretionary power to exempt him from deportation (*see* 8 USC § 1182 [c] [1994]). Thus, defendant Thomas is not entitled to vacatur of his plea based on the trial court's failure to advise defendant of what was, at the time, an entirely collateral consequence of his plea.

### III

Relying on *Padilla*, defendants Peque and Thomas additionally contend that their attorneys were ineffective for failing to tell them that their guilty pleas could result in deportation.[14] We must first determine whether those claims are properly before us on direct appeal. In that regard, we have admonished defendants claiming ineffective assistance of counsel to develop a record sufficient to allow appellate review of their claims (*see People v Haffiz*, 19 NY3d 883, 885 [2012]; *People v McLean*, 15 NY3d 117, 121 [2010]). Where a defendant's complaint about counsel is predicated on factors such as counsel's strategy, advice or preparation that do not appear on the face of the record, the defendant must raise his or her claim via a CPL 440.10 motion (*see People v Denny*, 95 NY2d 921, 923 [2000]; *People v Love*, 57 NY2d 998, 1000 [1982]).

In *Peque*, the plea and sentencing minutes do not reveal whether defense counsel misadvised or failed to advise defendant about the possibility of deportation before he pleaded guilty. At sentencing, counsel stated that defendant would be subject to deportation as a result of his plea and that counsel had informed defendant of his right to access the Guatemalan consulate, thereby indicating that counsel may have advised defendant on those matters prior to his plea. In light of the record evidence tending to contradict defendant's current complaints about his lawyer, it was incumbent on defendant to substantiate his allegations about counsel's advice below by filing a CPL 440.10 motion, and his failure to file a postjudgment motion renders his claim unreviewable (*see Haffiz*, 19 NY3d at 885 [because the defendant's *Padilla* claim was "predicated on

---

14. Because Chief Judge Lippman would reverse Peque's and Thomas's convictions on due process grounds, he does not express any view of their ineffective assistance claims. For the same reason, Judge Rivera does not address Peque's ineffective assistance claim, but she concurs with the Court's disposition of Thomas's due process and ineffective assistance claims (*see* op of Rivera, J., at 218).

hearsay matters and facts not found in the record on appeal," it should have been "raised in a postconviction application under CPL article 440"]).[15]

■ In *Thomas*, the limited record here and the trial court's credibility determinations doom defendant's claim. The record of the plea proceeding does not reveal whether defense counsel apprised defendant of the immigration consequences of his guilty plea. In support of his plea withdrawal motion, defendant averred that counsel had spoken with him about the immigration consequences of his plea and had misled him on that score, thus belying his current assertion that counsel completely failed to advise him about immigration issues. Additionally, defendant's newly retained attorney did not have personal knowledge of his prior counsel's advice, and therefore new counsel's allegation that predecessor counsel had failed to advise defendant about deportation did not reliably establish the nature of predecessor counsel's advice. Furthermore, the court did not abuse its discretion by discrediting defendant's contradictory allegations about counsel's performance (*see People v Baret*, 11 NY3d 31, 33-34 [2008]), and there is "no basis for disturbing the conclusion of both courts below" that defendant's claim was "too flimsy to warrant further inquiry" or vacatur of his plea (*id.* at 34).

## IV

Accordingly, in *People v Diaz*, the order of the Appellate Division should be modified by remitting the matter to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed. In *People v Peque* and *People v Thomas*, the order of the Appellate Division should be affirmed.

PIGOTT, J. (concurring in *People v Peque* and *People v Thomas*, and dissenting in *People v Diaz*).

## I

In my view, the majority (for want of a better word), seeking a middle ground between the diametrically opposed positions of

---

**15.** Defendant Peque also asks us to reduce his sentence as a matter of discretion in the interest of justice. However, because defendant received a lawful and statutorily authorized sentence in this noncapital case, his claim is beyond our purview, as only an intermediate appellate court is authorized to grant the discretionary sentencing relief which he seeks (*see* CPL 470.15 [6] [b]; *People v Discala*, 45 NY2d 38, 44 [1978]).

the People and the defendants in these cases, creates no new law, and simply leaves us where we were before. One majority, comprised of Chief Judge Lippman, and Judges Graffeo, Read, Rivera and Abdus-Salaam, concludes that the risk of deportation "must be mentioned by the trial court to a defendant as a matter of fundamental fairness" (op of Abdus-Salaam, J., at 193). Then, a different majority, Judges Graffeo, Read, Smith and Abdus-Salaam, which refers to itself as the "remedial majority" (*id.* at 198), takes away with one hand what had been given with the other. A court's failure to warn of the possibility of deportation does *not* automatically invalidate the plea (unlike the failure to warn a defendant of direct consequences of his plea, such as postrelease supervision). Rather, according to the remedial majority, a defendant's recourse is merely "a hearing to provide the defendant with an opportunity to demonstrate prejudice" (*id.* at 200). But that remedy was already available to defendants under CPL 440.10. In short, the remedial majority's analysis takes us nowhere new.

I would take a more straightforward approach. Deportation is a collateral consequence of a guilty plea, as the remedial majority concedes. We can infer from this that a defendant has no constitutional right to be informed by a state trial court judge of the possibility that the federal government may deport him or her.* However, under *Padilla v Kentucky* (559 US 356 [2010]), the Sixth Amendment requires a defendant's *counsel* to "inform her client whether his plea carries a risk of deportation" (559 US at 374). "Whether he is entitled to relief depends on whether he has been prejudiced" (*id.* at 360), and, in showing prejudice, defendant must demonstrate that, in addition to his counsel's failure to give the required advice, he was not informed by the trial court of the risk of deportation. If defendant can show that neither his counsel nor the trial court informed him of the possibility of deportation, and that he would not have pleaded guilty

* Such a warning is required by a statute, CPL 220.50 (7), which courts should, of course, follow, even if failure to do so is not reversible error. The statute was added

> "as a component of budget legislation designed to reduce prison population by facilitating deportation of convicted felons who are not citizens of the United States. The admonition the court is required to impart . . . is aimed at diluting the effectiveness of arguments made by aliens at deportation hearings that they would not have pleaded guilty had they known the conviction would result in loss of the privilege of remaining in this country" (Peter Preiser, McKinney's Cons Laws of NY, Book 11A, CPL 220.50 at 167).

had he been so informed, he will prevail at his postjudgment proceeding.

In short, I would reach a very similar conclusion to the remedial majority's, and, like the remedial majority, I would create no new law, but I would follow a far more direct path, based strictly on *Padilla*. The remedial majority's analysis gives defendants no practical benefit that *Padilla* does not already give them.

## II

Another, equally fundamental weakness affects the "majority" opinion. The majority comprised of Chief Judge Lippman, and Judges Graffeo, Read, Rivera and Abdus-Salaam does not agree on a rationale for its due process holding. Although Judge Abdus-Salaam does not say so expressly, no precedential analysis emerges from her opinion.

Judges Graffeo, Read and Abdus-Salaam "reaffirm[ ] the central holding of [*People v*] *Ford* [(86 NY2d 397 [1995])] regarding . . . the distinction between direct and collateral consequences of a guilty plea" (op of Abdus-Salaam, J., at 176; *see id.* at 196). The same Judges also reaffirm *Ford*'s holding that deportation is a collateral consequence of a guilty plea, adding only the qualifier "technically" before "collateral" (*id.* at 191 n 5, 191-192, 199), but never retreating from the basic premise.

So far, I have no quarrel; Judge Smith and I agree with Judges Graffeo, Read and Abdus-Salaam that deportation is a collateral consequence of a guilty plea. However, the plurality consisting of Judges Graffeo, Read and Abdus-Salaam (*see* op of Abdus-Salaam, J., at 191-192) then attempts to treat deportation as a sui generis consequence that is at once collateral and uniquely significant. In doing so, the plurality fails to do justice to the severity of collateral consequences such as SORA registration and SOMTA confinement. A person who has been civilly confined, possibly for the rest of his life, under Mental Hygiene Law article 10, would be surprised to learn that three members of our Court believe that he has not been "deprive[d] . . . of an exceptional degree of physical liberty" (op of Abdus-Salaam, J., at 192). In my view, the plurality's position contradicts our holdings in *People v Gravino* (14 NY3d 546 [2010] [SORA registration is a significant, but a collateral, consequence of a conviction]) and *People v Harnett* (16 NY3d 200 [2011] [same with respect to SOMTA commitment]).

## III

I agree that the Appellate Division orders in *People v Peque* and *People v Thomas* should be affirmed. However, with respect to *People v Diaz*, I do not agree that "the trial court clearly failed to tell defendant that he might be deported if he pleaded guilty" (op of Abdus-Salaam, J., at 200), the view taken by Chief Judge Lippman, and Judges Graffeo, Read, Rivera and Abdus-Salaam. Supreme Court told Diaz, "if you're not here legally *or if you have any immigration issues* these felony pleas could adversely affect you" (emphasis added), and the court elicited an acknowledgment that Diaz understood this. Although Diaz was a legal permanent resident of the United States, he was not a citizen. As such, he was not able to vote in United States elections, or remain outside the United States for lengthy periods of time, without running the risk of his permanent residency being deemed abandoned. In the circumstances, I believe that the reference to "immigration issues" was sufficient to make Diaz aware that the trial court's warning applied to him. It might have been preferable for Supreme Court to advise Diaz that, even if he was in the United States legally, a guilty plea might result in his deportation if he was not a United States citizen. But I cannot accept that, as a matter of law, Supreme Court's words implied that a guilty plea would not entail adverse immigration consequences for Diaz.

## IV

Nor should Diaz be permitted a second bite of the apple. Supreme Court denied Diaz's CPL 440.10 motion, agreeing with Diaz that his defense attorney had been ineffective, but holding that Diaz had not met his burden of showing prejudice, i.e. showing that he would not have pleaded guilty if warned by counsel of the risk of deportation. The Appellate Division denied Diaz leave to appeal Supreme Court's order, and consequently the proceeding did not reach us. Now the remedial majority remits the direct appeal to the trial court to, once again, "allow [defendant] to move to vacate his plea and develop a record relevant to the issue of prejudice" (op of Abdus-Salaam, J., at 200). But Diaz has already had his 440.10 proceeding (*see id.* at 179), and failed to establish any prejudice. It is therefore difficult to see what proceeding the remedial majority imagines should now occur.

## V

For these reasons, I cannot join Judge Abdus-Salaam's opinion. I would affirm in all three appeals (*but see People v Hernandez*, 22 NY3d 972, 977 [2013, Pigott, J., dissenting and voting to vacate defendant's plea following a CPL 440.10 proceeding] [decided today]).

Chief Judge LIPPMAN (dissenting). I respond to the opinion subscribed to by three Judges, whom I refer to as the plurality, because that is the only writing offering reasons for the results announced in the above-captioned appeals. Although I would join a writing finding a due process entitlement on the part of a noncitizen defendant to be advised by the court of the possible immigration consequences of pleading guilty *and* making relief available when that entitlement is not honored, the plurality opinion does not meet the latter condition and I accordingly do not join it. I do, however, agree with the Judges who have signed the plurality opinion and with Judge Rivera, that deportation is such an important plea consequence that "it must be mentioned by the trial court to a defendant as a matter of fundamental fairness" (plurality op at 193).

--------

The United States Supreme Court acknowledged in *Padilla v Kentucky* (559 US 356 [2010]) that "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence" (*id.* at 366). The Court, accordingly, declined to use the direct/collateral distinction to ascertain whether deportation was a conviction consequence of which a pleading noncitizen defendant was required to be advised. Instead, the Court took note of certain realities whose crucial bearing upon a noncitizen's decision whether to enter a plea of guilty were, by the time of the Court's decision, undeniable. Prominent among these was that deportation had, since the mid-1990s, become for noncitizen defendants a virtually automatic consequence of convictions falling within several very broad penal categories, and that deportation was a particularly harsh superadded exaction—one that the Court did not shrink from referring to as a "penalty" (559 US at 364). Indeed, the Court had already recognized that deportation was a conviction consequence often more dreaded by noncitizen defendants than any prison sentence that might be imposed, either pursuant to a plea agreement or after trial (*see* 559 US at

368, citing *INS v St. Cyr*, 533 US 289, 322 [2001]). In holding then that the constitutionally effective representation of a noncitizen contemplating the entry of a guilty plea required the provision of accurate advice as to the immigration consequences of the conviction that would ensue, the Court was driven by the recognition that a plea entailing deportation very often will be impossible to characterize as voluntary where that uniquely important consequence has not been disclosed to the defendant—that such pleas are categorically different from "the vast majority . . . [in which] the overwhelming consideration for the defendant is whether he will be imprisoned and for how long" (*People v Gravino*, 14 NY3d 546, 559 [2010]).

The question now presented is whether, after *Padilla*, the description of deportation as a direct or a collateral plea consequence retains viability as a means of defining, not counsel's, but the court's duty in assuring the voluntariness of a plea. The plain answer to this question must be that it does not. If deportation is "uniquely difficult to classify as either a direct or a collateral consequence," logically it is so for all purposes, not simply for the purpose of determining what advice counsel must give in satisfaction of the Sixth Amendment requirement of effective representation.

Once it is settled that the relevant inquiry is not whether deportation may be formally categorized as a direct or collateral consequence, but whether it is, as the *Padilla* Court observed, a consequence so certain, potentially pivotal and prevalent as to make its disclosure essential to assuring that the guilty plea of a noncitizen is knowing, intelligent and voluntary, it should be clear that the court's allocutional obligations in taking a noncitizen's plea are fully implicated. The realities shaping the court's obligations, with respect to the conviction consequence of deportation, are not essentially different from those to which counsel must be responsive in advising a noncitizen defendant.

It is by now practically self-evident that the judicial obligation in taking a plea—i.e., assuring on the record that the defendant fully understands what the plea connotes and its consequences (*see Boykin v Alabama*, 395 US 238, 244 [1969]), or, in other words, that "the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant" (*North Carolina v Alford*, 400 US 25, 31 [1970], citing *Boykin*, 395 US at 242)—cannot realistically be met in the case of a noncitizen defendant unless the court's canvass extends to ascertaining that the plea is made with the awareness that it may well result in the pleader's deportation.

The plurality, wisely, does not avoid this conclusion; to do so would, in a very large number of cases, be to reduce to a painfully obvious fiction the notion so favored by the law that the taking of a plea in open court serves as an effective procedural bulwark against an uninformed and thus involuntary surrender of basic constitutional protections to which the defendant would otherwise be entitled prior to any adjudication of guilt (*see e.g. Brady v United States*, 397 US 742, 747 n 4 [1970] ["the record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily"]; *Boykin*, 395 US at 242 ["prosecution (must) spread on the record the prerequisites of a valid waiver"]; *Carnley v Cochran*, 369 US 506, 516 [1962] ["The record must show . . . that an accused . . . intelligently and understandingly rejected (a constitutional right). Anything less is not waiver"]; *and see People v Cornell*, 16 NY3d 801, 802 [2011] ["due process requires that the record must be clear that the plea represents a voluntary and intelligent choice among . . . alternative courses of action" (internal quotation marks and citations omitted)]; *People v Louree*, 8 NY3d 541, 544-545 [2007]; *see also* plurality op at 184). Yet, while recognizing that the court has an independent due process obligation to notify a noncitizen defendant that his or her plea may result in deportation (plurality op at 176 ["We . . . hold that due process compels a trial court to apprise a defendant that, if the defendant is not an American citizen, he or she may be deported as a consequence of a guilty plea to a felony"])—a proposition with which I certainly agree—the plurality affords no remedy where that condition of due process has not been met, and in fact not one of the present appellants will in the end obtain relief.

If a plea proceeding fails of its essential purpose—if it does not create a record from which the knowing and voluntary nature of the defendant's waiver and concomitant choice between available alternative courses of action may be readily understood—the plea is infirm. And, in that case, the appropriate response is to permit the plea's withdrawal, not to cast about for a means of deeming the infirmity harmless (*see McCarthy v United States*, 394 US 459, 466 [1969] ["if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void"]). We have, in fact, permitted withdrawal as a matter of course where the defect in the plea amounts to a due process violation. In *People v Catu* (4 NY3d 242 [2005]), for example, we said:

"Because a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action, *the failure of a court to advise of postrelease supervision requires reversal of the conviction. The refusal of the trial court and Appellate Division to vacate defendant's plea on the ground that he did not establish that he would have declined to plead guilty had he known of the postrelease supervision was therefore error* (see also People v Coles, 62 NY2d 908, 910 [1984] ['harmless error rules were designed to review trial verdicts and are difficult to apply to guilty pleas']).

"*In light of this result, we do not reach defendant's alternative claim of ineffective assistance of counsel*" (*id.* at 245 [emphasis supplied]).

The Court's[1] present approach to dealing with a due process violation identical in kind to that addressed by *Catu*, although practically far more consequential, is precisely contrary to that deemed "require[d]" in *Catu*. The defendant's remedy now is said to lie in a postconviction motion in which it will be up to him or her—often without the aid of counsel and in a non-native tongue[2]—to navigate the postconviction relief maze in order to prove a circumstance that should have been, but was not, negated by the accepted plea—namely, that the plea was entered in ignorance of its deportation consequence, which, if disclosed, would, with reasonable probability, have caused its rejection. In short, having demonstrably been denied due process, a defendant is, under today's decision, relegated to a claim that reduces to one for ineffective assistance—a claim that would, in the vast majority of cases, have been obviated by a constitutionally adequate plea. It was, of course, in recognition of the primacy of the plea court's due process obligation, that *Catu* premised the right to plea withdrawal exclusively on the plea court's default, and consequently did not reach Catu's ineffective assistance claim. While the plurality stresses that the judicial obligation in

---

**1.** I refer here to the approach shared by the plurality and the dissenters for whom Judge Pigott has written, for as Judge Pigott has noted, those approaches are in their resolution practically indistinguishable. Neither affords noncitizen defendants relief from pleas that fail to establish the defendants' awareness of their deportation consequence.

**2.** We speak here of what *Padilla*, with doubtless accuracy, described as the "class . . . least able to represent themselves" (559 US at 370-371).

taking a plea is independent of the obligation of counsel to provide accurate advice as to a plea's immigration consequence (plurality op at 193), the net effect of its decision is remedially to telescope the two, so that a due process claim based on a judicial default will not occasion relief except where there is also an attendant meritorious *Padilla* claim. The plurality acknowledges that this is so but says that it is appropriate since in *People v Harnett* (16 NY3d 200 [2011]) it was observed in a purely theoretical aside that "the issue of whether the plea was voluntary may be closely linked to the question of whether a defendant received the effective assistance of counsel" (*id.* at 207). But the issue of whether a plea is actually voluntary, appropriately implicated in determining whether a plea should in fairness be vacated where the plea is not facially deficient—the circumstance to which the above-quoted language from *Harnett* speaks—is not the issue presented here. The issue posed in the present appeals is instead whether the plea itself comports with due process when its canvass does not extend to its immigration consequence. Having evidently held that it does not, it makes no sense at all to then require, as a condition of relief, that a defendant whose plea was facially deficient prove a negative— namely, that the due process denial was not harmless. Due process violations are presumptively prejudicial—that is why they are so classified. The accommodation of the contrary, illogical premise, could not have been within *Harnett*'s contemplation.

The delicacy with which the plurality treats *People v Ford* (86 NY2d 397 [1995])—a decision which, after *Padilla*, is in its two principal holdings, if not in its ratio decidendi, no longer viable—stands in strikingly awkward contrast to its abandonment of the remedial course charted in and required by *Catu*. Perhaps the plurality reasons that because deportation does not precisely fit the description of a direct conviction consequence and is, in its view "technically" a collateral consequence (plurality op at 192), that it is not governed by *Catu*. But this simply revives the direct/collateral distinction as a meaningful tool in characterizing deportation as a plea consequence. Not only is this use of the distinction demonstrably inapt after *Padilla*, it is utterly inconsistent with the plurality's correct conclusion that due process requires the plea to establish that a noncitizen defendant was advised of its possible deportation consequence. If, in fact, it continues to be material—even after *Padilla*—that deportation is not, strictly speaking, a "direct" conviction consequence within the meaning of *Ford*, it should follow that a plea court's nondisclosure of that consequence does not rise to

the level of a due process defect. But, that is a conclusion that the plurality, with ample empirical and legal justification, rightly eschews.

The plurality does not, however, eschew the remedial path hypothetically sketched in *Gravino* (14 NY3d at 559) and *Harnett* (16 NY3d at 207). Traveling it, however, is, as noted, inappropriate where the plea is affected by a due process deficiency such as the one the plurality identifies today. Plainly, the address of a due process violation was not what was intended when it was suggested in *Gravino* that a court might, as an "exercise [of] discretion" (14 NY3d at 559) vacate a plea if various conditions were met, among them that the defendant proved that, but for the nondisclosure of a consequence "of such great importance to him" (*id.*; *and see Harnett*, 16 NY3d at 207), he would not have pleaded guilty. The relief adverted to in *Harnett* and *Gravino* did not depend upon or respond to a default by the court in establishing the voluntariness of the plea; its purpose was rather to allow for a remedy precisely in those situations where the defendant was materially uninformed as to a plea consequence which, although of "great importance to him," was not one about which the plea court was obliged to warn. In the cases before us, by contrast, we deal with judicial omissions incompatible with due process and bearing critically upon the very basis of the plea. The remedy in that latter circumstance is not "discretionary" as per *Gravino*'s dicta, it is "required" as per *Catu*'s holding.

Today's plurality decision speaks eloquently of the severity of deportation as a conviction consequence (plurality op at 192-193), but in the end treats removal as just another collateral consequence that may be of "great importance" to a defendant, leaving the defendant to prove to the satisfaction of the court that took the plea, that the plea was uninformed as to the important consequence, and that, had that consequence been disclosed, the plea would not have been entered—or, at least, that the plea's rejection would have been reasonably probable. Thus, although the Court now roots the judicial obligation to inform a pleading noncitizen of immigration consequences in due process, as a practical matter judges and defendants remain just as they were—a judge's default in informing a noncitizen defendant that he may be deported will only be rectified in the context of a claim for what is essentially ineffective assistance of counsel, which is to say in the context of a claim that, of course, already exists, but is extraordinarily difficult to make

out (see e.g. *People v Hernandez*, 22 NY3d 972 [2013] [no reasonable probability that a defendant with six young children in this country would have rejected a plea to preserve a possibility of avoiding deportation]). The disjunction between the right recognized and the remedy offered is palpable. If due process requires a warning "to protect the rights of the large number of noncitizen defendants pleading guilty to felonies in New York" (plurality op at 197), it must be that the failure to give the warning is at least presumptively prejudicial. Here, however, the plurality illogically and unfairly places upon the demonstrably unwarned members of the vulnerable noncitizen class the formidable burden of proving individual prejudice.

In advocating the conceptually straightforward and until now legally uncontroversial notion, that a guilty plea unequal to the basic due process purpose of demonstrating that its entry was knowing and voluntary should be permitted to be withdrawn, I acknowledge the inevitable concern that its embrace in the present context would provoke a stampede to the courthouse. That concern, rationally assessed, I believe is exaggerated. New York has required by statute, now for some 18 years, that judges warn noncitizens of their pleas' potential immigration consequences (see CPL 220.50 [7]). It cannot be presumed that the statute has been pervasively ignored (see *Padilla*, 559 US at 372 ["For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea . . . We should, therefore, presume that counsel satisfied their obligation to render competent advice at the time their clients considered pleading guilty"]). But, if it has been, that is all the more reason to doubt the efficacy of substituting one toothless command[3] for another, as the plurality today proposes. Nor is there reason to believe that noncitizen defendants will rush to scuttle pleas that were genuinely advantageous, notwithstanding an unallocuted deportation consequence (see *Padilla*, 559 US at 372-373). Moreover, inasmuch as *Padilla* broke new ground "by

---

3. After requiring that noncitizen defendants be warned as to the possible immigration consequences of their contemplated pleas, CPL 220.50 (7) adds the proviso that the failure to give the prescribed warning "shall not be deemed to affect the voluntariness of a plea of guilty." That the plurality ultimately finds this proviso compatible with its notion of what due process avails a pleading defendant (plurality op at 199 n 12) is strikingly indicative of how very narrow its decision is.

breaching the previously chink-free wall between direct and collateral consequences" (*Chaidez v United States*, 568 US —, —, 133 S Ct 1103, 1110 [2013]), there is strong reason to suppose that any remedy stemming from the demise of that "chink-free wall" would be limited to cases still on direct appeal (*see id.*). Finally, in the long term, affording noncitizens prompt and effective relief from pleas that manifestly fail to provide the assurance of voluntariness that due process requires, will reduce rather than increase postconviction claims and thus protect rather than subvert the finality of plea-based judgments of conviction.

The conscientious provision of the already statutorily prescribed judicial warning—which all of the present appellants agree is adequate—would itself obviate the overwhelming majority of postconviction claims relating to undisclosed immigration consequences. And, in those presumably rare cases where, despite the remedy of plea withdrawal, there was a judicial default, all of the concerned parties would be spared complicated and prolonged motion practice; the defendant would simply, logically, fairly and expeditiously be given his or her plea back and proceed to trial on the indictment. I note that several jurisdictions have such a rule (*see* RI Gen Laws § 12-12-22 [c]; Cal Penal Code § 1016.5 [b]; Conn Gen Stat Ann § 54-1j [c]; DC Code § 16-713 [b]; Mass Gen Laws ch 278, § 29D; Ohio Rev Code Ann § 2943.031 [D]; Vt Stat Ann tit 13, § 6565 [c] [2]; Wash Rev Code § 10.40.200 [2]; Wis Stat Ann § 971.08 [2]); the sky has not fallen as a result.

The literal-minded application of the direct/collateral distinction, *Padilla* notwithstanding, has given rise to a state of affairs where a court must, on pain of reversal, inform a pleading defendant of a term of postrelease supervision (PRS) but may, without consequence, fail to disclose to the same defendant that the plea will result in deportation, an outcome not merely overshadowing but usually nullifying the term of postrelease supervision.[4] An analytic paradigm that would yield such an objectively skewed ordering of interests and corresponding

---

4.   The nullifying effect of deportation upon a PRS term was, of course, the circumstance about which defendant Peque's attorney wondered aloud, when the deportation issue surfaced at Peque's sentencing. He said, "Mr. [Peque] is subject to deportation following the completion of his sentence. I'm not sure how that's going to impact, assuming the Court imposes the sentence that's been agreed upon, I'm not sure how that will affect the post-release supervision aspect of it."

judicial concerns cannot and will not be viewed except as unmoored from the considerations of fundamental fairness that ought to animate our jurisprudence in passing upon pleas, the means by which guilt is established in the vast majority of criminal cases. Nothing in today's very long plurality decision functions to diminish this signal anomaly one whit. Calling the court's failure to advise of an immigration consequence a due process denial without affording the defendant a remedy for that denial amounts to no more than a verbal gesture. While the plurality insists that our precedents do not allow more, that is transparently incorrect. As noted, this Court has been clear as to the remedy required when a plea court fails to establish on the record, to the extent that due process requires, that a plea is a knowing and intelligent choice between available alternative courses of action. The notion, then, that the plurality is somehow constrained to withhold relief for the nonperformance of the "distinct" and "independent" judicial due process obligation it has postulated is altogether puzzling. It would be one thing if, like Judge Pigott, the plurality simply found that, *Padilla* notwithstanding, *Ford* remained good law for the proposition that judges have no due process duty to advise pleading noncitizens of immigration consequences. But, having found to the contrary, the failure to afford any logically and legally responsive remedy to noncitizen defendants left unwarned by the court as to the possible immigration consequences of their pleas represents a perplexing election—one that is in no way explained post-*Padilla* by clinging, practically as an article of faith, to an orthodoxy that, as the plurality opinion acknowledges at length, time and circumstance have overwhelmed, at least with respect to the characterization of immigration consequences for plea purposes.

Given the plurality's indisposition to navigate the not so complicated route from its understanding of what due process requires of a court taking a plea, to a logical and efficacious remedy when the standard it has set has not been met—indeed, its evident determination instead to follow a tortuous path influenced by what is, in the present context, a thoroughly discredited formalism—a legislatively prescribed remedy will be necessary to untie the Gordian knot now fashioned and protect the adjudicative rights of noncitizen criminal defendants.

---

I would reverse in each of the cases before us.

In *Peque*, although there was some fairly random mention of deportation at the sentencing proceeding (*see* n 4, *supra*), there was no judicial advisement at either plea or sentence as to the prospect of deportation, and Peque was manifestly confused as to what his plea involved. I do not, moreover, believe it reasonable to require preservation in this context. The purpose of the judicial advisement here at issue is to assure that the defendant is aware of the plea consequence. A preservation requirement presumes knowledge that would make the advisement unnecessary—a classic "Catch-22," particularly inappropriate when dealing with the class of defendants "least able to represent themselves" (*Padilla*, 559 US at 370-371) and where a meritorious claim for plea withdrawal—at least under the plurality formulation—presupposes that the defendant has been ineffectively represented.[5]

The advisement provided in connection with defendant Diaz's plea was, I believe, affirmatively misleading as to the likelihood of any immigration consequence and, on that ground, Diaz should be permitted to withdraw his plea and face trial on the indictment charging an A-I drug felony; if that is a risk he wishes to take to preserve the possibility of remaining in this country where he has resided legally for most of his life and has an infant child, he should be permitted to do so.

I would note in passing that Diaz's case illustrates the extreme procedural difficulty of obtaining relief by the means now prescribed. Although the plurality acknowledges that the "trial court clearly failed to tell [Diaz] that he might be deported" (plurality op at 200), and purports to afford him the possibility of relief, it logically precludes him from prevailing in any ensuing litigation, since the showing of prejudice it requires has already been made and found wanting; Diaz's CPL 440.10 motion was denied on the ground that he failed to satisfy the

---

**5.** In view of this latter circumstance, the utility of the plurality's advice that a noncitizen defendant seeking plea withdrawal for nonadvisement as to an immigration consequence "should make every effort to develop an adequate record of the circumstances surrounding the plea at sentencing" (plurality op at 199) is dubious. If counsel has, by hypothesis, been ineffective it does not seem reasonable to expect the same attorney to make a record as to the very matter as to which the representation was deficient. If, as the plurality points out, it is not generally prudent to assume that "defense counsel 'will' do something simply because it is required of effective counsel" (*Moncrieffe v Holder*, 569 US —, —, 133 S Ct 1678, 1692 [2013]) (plurality op at 193), surely it cannot be prudent to suppose that ineffective counsel will do something because it is required of effective counsel.

*Strickland* prejudice prong, and leave to appeal was thereafter denied by an Appellate Division Justice. Like Diaz, all defendants alleging a due process violation by reason of an inadequate plea, in order to obtain relief, would, under today's plurality decision, be compelled to split their claim between a direct appeal and a separate 440.10 proceeding—a complication that is pointless, since a defendant under current law, which the plurality does not alter in any practical respect, can in the end only obtain relief via a 440.10 claim for ineffective representation. Rather than temporize, I would afford Diaz actual relief from a plea that was not demonstrably knowing and voluntary.

Finally, as to defendant Thomas, inasmuch as his case is on direct appeal, I believe he is entitled to the benefit of our current jurisprudence. His postplea fraud upon the court logically has no bearing upon whether his plea was knowing, intelligent and voluntary, and there is no ground advanced by the plurality or the People to except from the rule that, ordinarily, a direct appeal from a judgment of conviction will be governed by the law as it exists at the time the appeal is decided (*see People v Jean-Baptiste*, 11 NY3d 539, 542 [2008])—a bright line demarcation we have adhered to, even where there has been lengthy delay attributable to the appellant (*see e.g. People v Martinez*, 20 NY3d 971 [2012]).

The People, I note, really do not identify any relevant prejudice traceable to defendant's fabrication of his demise. Thomas has already served his enhanced sentence. Even if his plea withdrawal motion is granted, and the People are unable to reprosecute him for lack of witnesses or physical evidence,[6] he will have been amply punished for his criminal conduct and for his chicanery. There is nonetheless a real and persisting issue as to the validity the plea upon which this punishment was based, and, in that connection, the People can claim no vested interest in the application of outdated precedent, or, in other words, the retention of the pre-*Padilla* legal context. This is especially so since *Padilla* was remedial; it responded to circumstances existing long before its issue in 2010 (*see Padilla*, 559 US at 362-363). Indeed, by 1992, the year of defendant's plea, deportation had become mandatory for noncitizens convicted of crimes falling into several broadly defined categories, one of which was for drug offenses; with a few closely drawn exceptions not applicable

---

**6.** It is noted that while the People raise these impediments to reprosecution on appeal in a general way, they have never made any concrete allegation that they would be unable to proceed against defendant on the sale counts with which he was initially charged.

cable to defendant, virtually all drug convictions by that time entailed automatic removal.[7]

The People, whose interest properly lies not simply in winning this appeal but doing justice, can claim no prejudice from *Padilla*'s application to Thomas's case. To the extent that the decision's "new rule" retroactively applied may unduly impair the finality of convictions, that has been dealt with by the Supreme Court in *Chaidez*, which limits *Padilla*'s backward reach to cases that have not become final, i.e., those, like defendant's, still on direct appeal (568 US at —, 133 S Ct at 1113).

In my view, Thomas's right to relief is made out by the record of his plea proceeding at which, five days after his alleged wrongdoing and before being indicted, Thomas, then a 21-year-old novice to the criminal justice system, entered a plea to attempted criminal sale of a controlled substance in the third degree in exchange for a disarmingly attractive 30-day jail sentence without being advised by the court, or indeed by anyone present, that, upon his release, he would be deported. It is, I believe, clear that Thomas's was not a knowing and voluntary plea.

RIVERA, J. (dissenting in *People v Peque* and *People v Diaz*, and concurring in *People v Thomas*). I concur with Judge Abdus-Salaam's opinion in *People v Thomas* that "defendant Thomas's challenge to the voluntariness of his plea must be evaluated in light of the practical and legal relationship between a criminal conviction and deportation at the time he pleaded guilty in 1992" (op of Abdus-Salaam, J., at 201), and as such, defendant is not entitled to relief for the reasons stated therein.

I join the Chief Judge's dissent in *People v Peque* and *People v Diaz* in all respects because I believe the trial court's failure to advise a noncitizen that the plea may potentially subject defendant to deportation requires automatic vacatur.* I write separately because, in addition to all of the arguments so cogently and comprehensively discussed in the Chief Judge's dissent, to the extent Judge Abdus-Salaam's opinion grounds its

---

7. As defendant observes, the immigration consequences of his plea to an attempted drug sale were dictated by 8 USC § 1251 (a) (2) (B) (i), a statute materially identical to its successor, 8 USC § 1227 (a) (2) (B) (i), the provision that applied to Padilla, and which was described by the Supreme Court as "succinct, clear, and explicit" (559 US at 368).

* I also agree with the Chief Judge's dissent in *Peque* that requiring preservation is not reasonable. In my opinion, defendant should not be penalized by demanding preservation when at the time that defendant Peque entered a

due process analysis on the immigration status of noncitizen defendants, then violation of these defendants' rights as so recognized mandates a status-based response. The "reasonable probability" test, however, is not status-based, but rather an individualized multifactor balancing test under which the defendant must establish prejudice.

If deportation implicates due process for a noncitizen defendant, based solely on, and because of, that very immigration status and its attendant devastating consequences, then those consequences are no less consequential as an individualized matter. By locating noncitizen defendants in a rarefied criminal justice system—one that recognizes immigration status as the basis for a due process claim, but which simultaneously denies a status-based remedy—the opinion constructs an ultimately flawed legal framework.

Judges GRAFFEO and READ concur with Judge ABDUS-SALAAM; Judge PIGOTT concurs in result in an opinion in which Judge SMITH concurs; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge RIVERA concurs in a separate opinion.

In *People v Peque*: Order affirmed.

Judges GRAFFEO and READ concur with Judge ABDUS-SALAAM; Judge SMITH concurs in result; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge RIVERA concurs in a separate opinion; Judge PIGOTT dissents and votes to affirm in an opinion.

In *People v Diaz*: Order modified by remitting to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

Judges GRAFFEO and READ concur with Judge ABDUS-SALAAM; Judge PIGOTT concurs in result in an opinion in which Judge SMITH concurs; Judge RIVERA concurs in result in a separate opinion; Chief Judge LIPPMAN dissents and votes to reverse in an opinion.

In *People v Thomas*: Order affirmed.

---

plea the law in New York specifically foreclosed the relief he now seeks (*see People v Ford,* 86 NY2d 397, 403-404 [1995] [finding deportation is a collateral consequence of a guilty plea and therefore the court has no duty to inform defendant of such consequence during allocution]; *see also* CPL 220.50 [7] [failure to advise defendant that guilty plea could result in deportation "shall not be deemed to affect the voluntariness of a plea of guilty or the validity of a conviction"]).